**Steven M. DesROSIERS, Plaintiff, Appellant,**

v.

**John J. MORAN, et al., Defendants, Appellees.**

No. 90–2121.

United States Court of Appeals, First Circuit.

Submitted Sept. 6, 1991.

Decided Nov. 15, 1991.

Steven M. DesRosiers, on brief pro se.

Anthony A. Cipriano, Deputy Chief, Legal Services, Rhode Island Dept. of Corrections, on brief for appellees.

Before BREYER, Chief Judge, and SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

Plaintiff-appellant Steven M. DesRosiers is an inmate at the Adult Correctional Institutions (ACI), Cranston, Rhode Island (a state prison). Invoking 42 U.S.C. § 1983 (1988), DesRosiers sued eight state actors in the United States District Court for the District of Rhode Island.[1] His principal contention was that the defendants failed to furnish him adequate medical care during his incarceration, thereby violating the Eighth Amendment (applicable to state actors by means of the Fourteenth Amendment). After a bench trial at which DesRosiers represented himself, the district court

entered judgment for the defendants. Des-Rosiers appeals. We affirm.

## I

The trial testimony revealed that, in 1987, DesRosiers was a maximum-security inmate at the ACI. In April, he underwent surgery at Rhode Island Hospital (RIH) to remove a pilonidal cyst from his lower back and buttocks. Following the operation, DesRosiers was transferred to the ACI and placed in a high-security infirmary ward. The parties agree that DesRosiers' stay at RIH and the prison infirmary was unremarkable. They likewise agree that he was doing reasonably well when he returned to the ACI's maximum-security facility on May 12, 1987 (after a check-up at RIH). At that time, RIH physicians recommended to the ACI's medical staff that DesRosiers—who, once back in maximum security, was immediately shunted to the punitive segregation unit (PSU) in order to fulfill a previous disciplinary sanction—should shower thrice daily and have the dressing on his wound changed at like intervals.

DesRosiers asserted that this prescribed regimen was thwarted because the defendants either denied, or interfered with, the recommended course of treatment. He testified to a pattern of callousness and neglect. Specifically, he criticized members of the ACI's nursing staff for refusing to assist him in changing his bandages. He also accused the guards of preventing him from taking the suggested number of showers. In a contrary vein, the defendants contended that literal compliance with the RIH recommendations was not constitutionally mandated; that DesRosiers was allowed to perform sufficient ablutions; and that the medical staff effectively fulfilled the rest of the regimen by helping DesRosiers on some occasions and, on other occasions, giving him supplies with which to change his own dressings. Specifically, ACI nurses testified that the plaintiff's condition was closely monitored by

---

1. At the times material hereto, each defendant, in one way or another, was involved either with the operation of the ACI or with the provision of medical care to inmates. For the purposes at hand, we need not differentiate among the eight defendants.

doctors and nurses alike, both before and during his confinement in the PSU; that DesRosiers had been given an ample supply of sterile dressings and cleansing solution to conduct self-care during the nurses' busiest shift (3:00–11:00 p.m.); and that the plaintiff's dressings were regularly checked and changed by medical personnel on less frenetic shifts. Nurse Stephenson testified that there was nothing in the plaintiff's treatment protocol that contradicted the use of self-care to change dressings. Moreover, she said that the plaintiff was entirely capable of assisting himself in this regard. Nurse Wilburn testified along the same lines. In her testimony, the plaintiff's surgeon confirmed that, with some initial tutelage, post-surgical patients should normally be able to change their own dressings. The plaintiff's contention that he was denied the specified number of showers was undermined by testimony from correctional officer Ricci.

The plaintiff was released from segregation after eighteen days. It is uncontradicted that, while at the PSU, he developed a nasty infection in his surgical wound. Medical evidence about the cause of the infection was inconclusive. Documentary proof was scant; in point of fact, the evidence was scattershot as to whether, and if so, to what extent, the prison's medical staff was required to document the delivery of routine services. Lack of adequate prophylactic care could, of course, have brought about such a condition. There were, however, several other possibilities. For example, DesRosiers' surgeon admitted that surgical wounds of this type are highly susceptible to infection even if good hygienic practices are assiduously followed.

On this pleochroic record, the district court found that the defendants made an honest, good-faith effort to provide DesRosiers with the best care possible in light of prison conditions characterized by limited staffing and precarious safety. The court determined that, while DesRosiers did not always receive three daily showers, he was invariably afforded the opportunity to shower at least once a day. The court found that DesRosiers was provided with a satisfactory supply of bandages and kindred materials and that he was capable of changing his dressings without assistance. The court also found, in substance, that the level of care which DesRosiers received was adequate, if not ideal. Based on these findings, the court concluded that DesRosiers had failed to prove an Eighth Amendment violation.[2]

## II

Having reviewed the record with care, we believe that the district court's findings and conclusions are supportable both legally and factually. We elaborate, albeit briefly.

### A.

■ The Eighth Amendment, by its terms, prohibits the infliction of "cruel and unusual punishment." When, as here, a convict claims that state prison officials violated the Eighth Amendment by withholding essential health care, he must prove that the defendants' actions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Deliberate indifference is conduct that offends evolving standards of decency in a civilized society. *See Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Estelle*, 429 U.S. at 102–03, 97 S.Ct. at 290–91. As such, it has both an objective component (was there a sufficiently serious deprivation?) and a subjective component (was the deprivation brought about in wanton disregard of the inmate's rights?). *See Wilson v. Seiter*, —— U.S. ——, 111 S.Ct. 2321, 2324–25, 115 L.Ed.2d 271 (1991). In prac-

2. The district court expressed no opinion on, and DesRosiers' appeal does not raise questions anent the merits of any state-law tort claims. And, although DesRosiers' brief on appeal does mention the Due Process Clause, the parameters of substantive due process are, for our purposes, coterminous with those of the Eighth Amendment. *See, e.g., Archie v. City of Racine*, 847 F.2d 1211, 1218–20 (7th Cir.1988) (en banc), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).

tice, as this case illustrates, these components may overlap or merge.

In evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials. *See id.* 111 S.Ct. at 2326. Moreover, inadvertent failures to provide medical care, even if negligent, do not sink to the level of deliberate indifference. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986); *Layne v. Vinzant,* 657 F.2d 468, 471 (1st Cir.1981); *Ferranti v. Moran,* 618 F.2d 888, 890–91 (1st Cir.1980). In order to establish deliberate indifference, the complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. *See Wilson,* 111 S.Ct. at 2324–25; *Steading v. Thompson,* 941 F.2d 498, 500 (7th Cir.1991). The requisite state of mind may be manifested by the officials' response to an inmate's known needs or by denial, delay, or interference with prescribed health care. *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291–92. While this mental state can aptly be described as "recklessness," it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable. *See Wilson,* 111 S.Ct. at 2324–26; *McGill v. Duckworth,* 944 F.2d 344, 347 (7th Cir.1991).

### B.

Next, we consider the supportability of the district court's factual findings. In performing this task, our standard of review is highly respectful. Under Fed. R.Civ.P. 52(a), we assay findings of fact in a bench trial only for clear error.[3] *See, e.g., Jackson v. Harvard Univ.,* 900 F.2d 464, 466 (1st Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990); *Keyes v. Secretary of the Navy,* 853 F.2d 1016, 1019 (1st Cir.1988). Deference to the nisi prius court is particularly appropriate where, as here, the evidence is in disarray

and the court's findings pivot on credibility determinations. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *Rivera–Gomez v. de Castro,* 900 F.2d 1, 4 (1st Cir.1990); *Reliance Steel Prods. Co. v. National Fire Ins. Co.,* 880 F.2d 575, 576 (1st Cir.1989). It is of no consequence whether we, if painting on an empty canvas, would have found the facts differently. *Langton v. Johnston,* 928 F.2d 1206, 1219 (1st Cir. 1991); *Jackson,* 900 F.2d at 466.

In the situation at hand, each of the findings of fact made below derives ample support from the record. Thus, applying the proper standard, there is no principled way in which we can disturb them. Although a different factfinder might conceivably have given the evidence a different construction and therefore reached a different set of conclusions, the lower court's findings must be honored. It is firmly settled, after all, that, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1512.

### C.

We now integrate the law with the facts as supportably found. Assuming, purely for the sake of argument, that DesRosiers' surgery created a serious medical need, we cannot say that the court below erred in holding that the defendants' failure to have a nurse change DesRosiers' bandages three times a day, even if coupled with some curtailment of shower access, could not be equated with deliberate indifference to his medical needs. The prison staff did not ignore DesRosiers' medical condition, deprive him of needed care in any constitutionally significant sense, or display an intention of punishing him by withholding treatment. The testimony demonstrated rather conclusively that Des-Rosiers had successfully changed his bandages on many occasions and that the defen-

---

**3.** The rule provides in pertinent part:
Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall

be given to the opportunity of the trial court to judge the credibility of the witnesses.
Fed.R.Civ.P. 52(a).

dants were not fully aware either of any special difficulties he may have had in doing so or of any special hazards involved in that praxis. The nurses supplied DesRosiers with saline solution, gauze bandages, sterile bowls, and instructions for self-ministration. The testimony established that it was not uncommon for patients, having undergone comparable operations, to assume significant responsibility for their own care. Although it might have been preferable had DesRosiers' dressings invariably been changed by third parties, the departure can scarcely be said to offend accepted standards of decency, indicate obduracy, constitute recklessness in the criminal-law sense, or amount to the wanton infliction of unnecessary pain. *See, e.g., Sires v. Berman,* 834 F.2d 9, 12–13 (1st Cir.1987) (inmate patient failed to show that a third party was needed to administer medical treatment when similarly situated civilian patients did not depend on others to treat their ailments); *cf. United States v. DeCologero,* 821 F.2d 39, 43 (1st Cir.1987) (a penal institution's obligation to deliver health care to its constituency "is met in full measure by the provision of *adequate* services") (emphasis supplied).

Much the same can be said for any shortfall in the shower quotient. There is simply no basis to infer that the defendants knew that infection would result from the effect of lessened shower time, even when superimposed upon the incidence of self-administered dressing changes.[4] Given the lower court's supportable finding that DesRosiers received at least daily access to the shower facilities, together with the lack of any competent evidence that (a) the denial of more frequent showers caused the plaintiff's condition to worsen, or (b) the guards were motivated by any improper animus, the district court did not err in concluding that plaintiff's constitutional rights were unaffected.

On the weight of the credible proof, it seems to us, as it did to the court below, that the defendants' conduct amounted at worst to some specie of carelessness. Con-

siderably more was required to make out a federal case. *See, e.g., Ortiz v. City of Imperial,* 884 F.2d 1312, 1314 (9th Cir. 1989) (per curiam) (medical malpractice is not sufficient, in itself, to constitute deliberate indifference); *Wester v. Jones,* 554 F.2d 1285, 1286 (4th Cir.1977) (per curiam) (similar). Put another way, a claim of inadequate medical treatment which reflects no more than a disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment.

In sum, the proof falls far short of compelling a finding that DesRosiers' treatment was so grossly inadequate as to constitute a knowing denial of proper medical care. *Compare Gill v. Mooney,* 824 F.2d 192, 195–96 (2d Cir.1987) (guards' deliberate defiance of prison doctor's express instructions, solely for purpose of causing prisoner unnecessary pain, could transgress the Eighth Amendment); *Miranda v. Munoz,* 770 F.2d 255, 259 (1st Cir.1985) (medical attention given to epileptic pretrial detainee was so inadequate that it resulted in death and constituted deliberate indifference). We therefore decline to second-guess the trial court's evaluation of either the defendants' mental state or the adequacy of the treatment rendered. Having studied the record, we are not "left with the definite and firm conviction that a mistake has been committed." *In re Tully,* 818 F.2d 106, 109 (1st Cir.1987) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

III

█ The plaintiff also complains that the district court failed to allow him to show a violation of certain regulations pertaining to the operation of the ACI (the Morris Rules). The Morris Rules were promulgated in consequence of a consent decree entered by the United States District Court for the District of Rhode Island. That

---

**4.** For that matter, there was no solid evidence that either poor hygiene or bungled bandaging caused DesRosiers' infection.

decree, dated April 20, 1972, memorialized the settlement of a class action brought on behalf of all inmates then *in situ* at the ACI and all future inmates. *See Rodi v. Ventetuolo,* 941 F.2d 22, 23 (1st Cir.1991) (discussing origin of Morris Rules). The current text of the rules is reproduced in *Morris v. Travisono,* 499 F.Supp. 149, 161–74 (D.R.I.1980). The plaintiff claims that, in his case, the doctor's "prescribed orders were not carried out," thus denying him "daily access to medical facilities" as required by the Morris Rules. Appellant's Brief at 14.

We view this as a non-issue. With respect to inmates confined in the PSU, the Morris Rules direct in broad generality that "access to medical facilities" be made available. *See Morris v. Travisono,* 499 F.Supp. at 173. But that generality does not require access on demand. Here, nothing in the record suggests that plaintiff was denied *needed* access to medical facilities or that essential medical care was withheld. The Morris Rules were, therefore, cumulative, *see infra,* if not altogether irrelevant.

There is, of course, a more fundamental reason why the Morris Rules were inconsequential in this instance. Not every breach of prison regulations will give rise to an Eighth Amendment claim. What counts is whether the official conduct of which the plaintiff complains was in derogation of the constitutionally mandated "deliberate indifference" standard.[5] *See McGill,* 944 F.2d at 349 (guard's violation of prison's rules not equivalent to Eighth Amendment violation); *Amsden v. Moran,* 904 F.2d 748, 757 (1st Cir.1990) (a state actor does not infract the substantive component of the due process clause merely by violating a state law or regulation), *cert. denied,* — U.S. —,

111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *Strachan v. Ashe,* 548 F.Supp. 1193, 1202 (D.Mass.1982) (similar; Eighth Amendment case); *see generally Paul v. Davis,* 424 U.S. 693, 700, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). In fine, regardless of what the Morris Rules provided, the district court's finding that the care given exceeded the minimum required by the Eighth Amendment was dispositive of Des-Rosiers' claim. The Morris Rules were beside the point.[6]

## IV

The plaintiff complains that the lower court erred in not compelling production of certain documents. The record is murky as to the documents' exact nature. As best we can piece it together, DesRosiers maintains that a management study (the Study) was done by Carter–Global Associates; that, in the course of the Study, Carter–Global prepared a series of treatment policies and procedures; and that, at some unspecified time in 1987, these policies and procedures were codified in a health care manual (the Manual) and put into effect at the ACI.[7] In order to place the ostensible error into perspective, we first trace the history of the discovery request. We then consider plaintiff's asseverations.

### A.

On August 12, 1989, the plaintiff served a demand for document production pursuant to Fed.R.Civ.P. 34. That demand sought, *inter alia,* the production of "[a]ny and all policies that establish[ed] the duties and responsibilities of [the] defendants" as well as "[a]ny and all policies concerning the treatment and care of [sic] medically prescribed treatment to inmates by the medical staff at the ACI." The defendants

---

**5.** We emphasize that the plaintiff has not claimed, either below or on appeal, that his transfer into punitive segregation was itself violative of the Morris Rules—a distinction of considerable import. *See, e.g., Rodi,* 941 F.2d at 28 (ruling that emergency detention provisions of the Morris Rules create liberty interests implicating procedural due process rights).

**6.** To be sure, in some cases the violation of a prison rule might be relevant to cast light upon

an official's intent. *See, e.g., Strachan,* 548 F.Supp. at 1202. But that point has no pertinence here, given the generality with which the rule in question was written.

**7.** The Manual was apparently kept at the nurses' station in the maximum-security wing. Neither the Study nor the Manual are part of the record below.

objected, claiming overbreadth and burdensomeness. Some four months later, on January 18, 1990, the plaintiff moved to compel. No objection appearing, the motion was granted under the local rules. *See* D.R.I.L.R. 12(a)(2) (unopposed motions may, in the district court's discretion, be deemed granted).

On June 8, 1990, a pretrial hearing was held. Despite the twin facts that (1) the plaintiff knew the Study and the Manual existed, and (2) neither had been produced, the docket entry does not indicate that he called this situation to the court's attention. On October 12, 1990, the case was reached for trial. Once again, the plaintiff said nothing about the missing documents. The first witness was Dr. William Chang, an ACI physician. The plaintiff began to question Dr. Chang about the Study. Defense counsel objected, claiming unfamiliarity with the Study and the Manual. Ultimately, the plaintiff demanded that the documents be produced for introduction into evidence. The judge questioned DesRosiers closely about how those items would be relevant to the constitutional claim. DesRosiers responded that the Manual would show that, notwithstanding his placement in the PSU, he should have been accorded access to medical facilities. After a lengthy colloquy, the district court postponed ruling on the plaintiff's request "for the moment." The trial continued that day and was resumed on November 1, 1990. The plaintiff never renewed his request for the Manual and the court never formally ruled on the request.

### B.

■ DesRosiers argues, first, that the defendants were obliged to produce the documents during pretrial discovery and that their failure to do so necessitates retrial. Accepting the plaintiff's premise—that the Study and the Manual fell within the scope of the pretrial production order—his conclusion nevertheless overlooks the realities of the record.

■ Ordinarily, if a failure to make timely discovery comes to light before or during trial, the remedy is to order the information produced and to take immediate steps to cure any prejudice. Depending on the nature of the breach, such curative steps might involve a continuance, *see, e.g., Jackson,* 900 F.2d at 468–69, a mistrial, *see, e.g., Taylor v. Illinois,* 484 U.S. 400, 413, 108 S.Ct. 646, 655, 98 L.Ed.2d 798 (1988) (listing possible remedies for discovery violations, including the declaration of a mistrial), a preclusionary order, *see, e.g., Navarro de Cosme v. Hospital Pavia,* 922 F.2d 926, 932 (1st Cir.1991); *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1081–82 (1st Cir.1989), or striking the responsible party's pleadings, *see, e.g., Marquis Theatre Corp. v. Condado Mini Cinema,* 846 F.2d 86, 88–90 (1st Cir.1988). But, DesRosiers sought none of these anodynes below, electing instead to proceed with the ongoing trial. Under such circumstances, granting a retrial on the ground that a discovery violation occurred would amount to giving the plaintiff two bites at the cherry.[8] We decline to do so.

### C.

The conclusion that the plaintiff cannot rewardingly assign error to the discovery violation does not end our inquiry. The fact remains that the plaintiff demanded production of the Manual *at trial* and did not receive it. The plaintiff says that this denial was itself reversible error.

■ We think this argument is doubly flawed. For one thing, the plaintiff's mid-trial request was not denied; rather, the court deferred it. The plaintiff chose neither to resurrect the issue nor to ask the

---

**8.** We note, too, that the colloquy below makes it crystal clear that the plaintiff knew, well in advance of trial, that the Study and Manual existed. Yet, he failed to bring the matter of non-production to the court's attention at the pretrial hearing or in some other timely fashion. In similar circumstances, courts have often deemed discovery violations to have been waived. *See, e.g., Clinchfield R.R. v. Lynch,* 700 F.2d 126, 132 (4th Cir.1983); *Allen Pen Co. v. Springfield Photo Mount Co.,* 653 F.2d 17, 23 (1st Cir.1981); *Ali v. A & G Co.,* 542 F.2d 595, 596 (2d Cir.1976); *Steinberg v. Ogden Foods, Inc.,* 501 F.2d 1339, 1341 (6th Cir.1974) (per curiam); *Butler v. Pettigrew,* 409 F.2d 1205, 1207 (7th Cir.1969).

judge at a later time to make an up-or-down ruling. In our view, a party who seeks a ruling must persist in his quest to some reasonable extent. If the court postpones action, the proponent must ordinarily call the matter to the court's attention at a later point in the trial if he is to preserve his rights. *See United States v. Benavente Gomez*, 921 F.2d 378, 385 n. 3 (1st Cir.1990) (where the court defers ruling on an objection, the objector must "renew his objection later to preserve ... the point"); 1 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 103[02], at 103–23 (1986) (if court reserves ruling, it is the proponent's obligation to raise the point again). Under the circumstances, DesRosiers' mid-trial request was waived.

■ For another thing, we doubt the relevancy of the Manual. DesRosiers made it plain that he wanted the Manual during trial to show that, notwithstanding confinement in the PSU, his access to medical facilities should not have been curtailed. But, as we have already made clear, *see supra* Part III, DesRosiers failed to prove that he had a legitimate medical need for such access, beyond that received, during the period in question. Moreover, the record does not show that the treatment policies were actually in effect during the spring of 1987 (when the critical events transpired). Under all the circumstances, the plaintiff has failed to establish that the Manual was relevant to any genuine issue before the court. *See, e.g., Bemis v. Kelly*, 857 F.2d 14, 18 (1st Cir.1988) (it is the proponent's burden to demonstrate the relevancy of proffered evidence); *see generally* Fed.R.Evid. 401 (defining "relevant evidence" as evidence tending to make more or less probable "the existence of any fact that is of consequence to the determination of the action"). The lower court did not abuse its wide discretion by not ordering production of the Manual during the trial proper. *See Veranda Beach Club Ltd. Ptship. v. Western Sur. Co.*, 936 F.2d 1364, 1373 (1st Cir.1991) ("In the federal system, a trial court has appreciable flexibility in ... excluding evidence on relevancy grounds.").

## V

Applicable law provides that, with respect to suitors who proceed in *forma pauperis*, "[t]he court may request an attorney to represent any such person [who is otherwise] unable to employ counsel." 28 U.S.C. § 1915(d) (1988). The plaintiff claims that the district court erred in not granting his serial requests for counsel under that statute. We review the lower court's ruling under an abuse-of-discretion standard.

■ We start with bedrock. There is no absolute constitutional right to a free lawyer in a civil case. *Bemis*, 857 F.2d at 15; *Childs v. Duckworth*, 705 F.2d 915, 922 (7th Cir.1983). Hence, to succeed on this assignment of error, DesRosiers must demonstrate that he was indigent and that exceptional circumstances were present such that a denial of counsel was likely to result in fundamental unfairness impinging on his due process rights. *See Childs*, 705 F.2d at 922.

■ Although the record is scumbled, it seems probable that DesRosiers cannot vault even the first of these hurdles. When a litigant asserts his indigency, he must carry the devoir of persuasion. Here, DesRosiers twice applied for *forma pauperis* status, but the district court appears never to have found him eligible. Indeed, the court ordered him to pay filing fees and the like, and he did so. The court also suggested that attorneys could be found to represent the appellant on a contingent fee basis. With the case in this posture, the district court's refusal to appoint counsel cannot rewardingly be assigned as error. *See Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir.1988) (per curiam) (§ 1915(d) only allows appointment of counsel where a litigant is indigent); *Hudak v. Curators of Univ. of Mo.*, 586 F.2d 105, 106–07 (8th Cir.1978) (per curiam) (fact that case is one where contingent fee seems feasible bears on district court's exercise of discretion under 28 U.S.C. § 1915(d)), *cert. denied*, 440 U.S. 985, 99 S.Ct. 1799, 60 L.Ed.2d 247 (1979); *cf. Temple v. Ellerthorpe*, 586 F.Supp. 848, 850–53 (D.R.I.1984) (discuss-

ing indigency vis-a-vis 28 U.S.C. § 1915 in pro se prisoner cases).

Even if DesRosiers were financially eligible for the balm of 28 U.S.C. § 1915(d), the court would not have been compelled to invoke the statute. To determine whether there are exceptional circumstances sufficient to warrant the appointment of counsel, a court must examine the total situation, focusing, *inter alia,* on the merits of the case, the complexity of the legal issues, and the litigant's ability to represent himself. *See, e.g., Cookish v. Cunningham,* 787 F.2d 1, 2–3 (1st Cir. 1986) (per curiam); *Childs,* 705 F.2d at 922; *Maclin v. Freake,* 650 F.2d 885, 887–88 (7th Cir.1981) (per curiam). We will overturn the denial of a request for appointed counsel in a civil case only if the record, taken as a whole, reflects a manifest abuse of the trial court's broad discretion. *See Jackson v. Cain,* 864 F.2d 1235, 1242 (5th Cir.1989); *Richards v. Harper,* 864 F.2d 85, 87 (9th Cir.1988).

We think that this case falls short of the mark. From the start, given the elevated Eighth Amendment threshold, DesRosiers' chances of success appear to have been modest—a factor which militates against appointing counsel, *See Childs,* 705 F.2d at 922. The legal issues were not especially complex: the facts were less than arcane and the applicable law, insofar as it impacted this case, was not beyond a layman's comprehension. Such a combination—readily mastered facts and straightforward law—strongly suggests that appointed counsel should be denied in a civil case. *See, e.g., Cookish,* 787 F.2d at 4; *Maclin,* 650 F.2d at 889. Moreover, the record indicates that DesRosiers was quite capable of examining the witnesses and adducing his side of the story. He displayed relative familiarity with the legal process, exhibited no functional impairments, drafted intelligible pleadings, and provided citations to support his legal theories. To be sure, DesRosiers self-deprecatingly offers examples of his difficulties in expressing himself at trial in an effort to show the existence of exceptional circumstances. The transcript, however, bears contrary witness. It demonstrates that, all things considered, DesRosiers handled matters well.

Then, too, we think it is significant that a jury was not empaneled. In a bench trial, the judge is better able to ensure that self-representation does not become an unendurable burden. This case exemplifies the point. Here, any potential unfairness was alleviated during trial by the judge's frequent intervention and questioning to help DesRosiers articulate questions for his examination of the witnesses. Considering the totality of the circumstances, it is extremely unlikely that counsel would have materially aided DesRosiers in achieving a more satisfactory outcome. Thus, the trial judge did not misuse his discretion by denying the appellant's serial motions for appointed counsel. *Compare In Re Lane,* 801 F.2d 1040, 1041–42 (8th Cir.1986); *Childs,* 705 F.2d at 922–23.

## VI

We need go no further. Although DesRosiers has advanced other arguments, none warrant extended comment. It suffices to say that we have considered all the contentions raised by the appellant and find them lacking in merit. The judgment of which DesRosiers complains was anchored in fact and rendered in accordance with appropriate legal standards after a trial unmarred by reversible error.

*Affirmed.*