Bernardo **FIGUEROA**

v.

George A. **VOSE, Jr.,** Joseph Marocco, Tej Bansal, M.D., Rose M. DiGuilio and Marion Brown.

Civ. A. No. 92–0629L.

United States District Court, D. Rhode Island.

Sept. 13, 1994.

Bernardo Figueroa, pro se.

David J. Gentile, Office of Legal Dept., Dept. of Corrections, Cranston, RI, for defendants.

## MEMORANDUM AND ORDER

LOVEGREEN, United States Magistrate Judge.

In this matter brought pursuant to 42 U.S.C. § 1983, plaintiff, a state prisoner, asks the court to decide that his post-operative medical care provided or supervised by these defendants following eye surgery on November 10, 1992 does not meet the requirements of the Eighth and Fourteenth Amendments to the United States Constitution.

This matter was referred to me for all further proceedings and entry of judgment pursuant to 28 U.S.C. § 636(c) and the consent of the parties. Trial was held on July 21, 1994 and August 24, 1994.

### Background

On November 18, 1992, plaintiff, Bernardo Figueroa ("Figueroa"), filed this complaint alleging a violation of his constitutional rights. Specifically, Figueroa alleges that he has been denied prescribed medications and follow-up care after his eye surgery of November 10, 1992. Defendants are George A. Vose, Jr. ("Vose"), Director of the Rhode Island Department of Corrections ("DOC"), Joseph Marocco ("Marocco"), Health Care Administrator for DOC, Dr. Tej Bansal ("Bansal"), a staff physician for DOC, Rose M. DiGuilio ("DiGuilio"), a staff nurse for DOC, and Marion Brown ("Brown"), also a staff nurse for DOC. Defendants are sued in their individual capacities.

Plaintiff alleges that prior to November 10, 1992 he suffered from an eye condition known as pterygium[1]. On November 10, 1992, he was transported by DOC personnel to the Rhode Island Hospital ("RIH") where he underwent a procedure known as pterygium excision of the right eye. The surgery was performed by Dr. Daniel Petashnick and Dr. Joseph Dowling. Following the surgery, plaintiff was prescribed Maxitrol ointment and Tylenol # 3. He was returned to the Adult Correctional Institutions ("ACI") where Dr. Chang, an ACI staff physician, provided a telephone order recorded by defendant DiGuilio for Tylenol # 3 every 4 hours for 24 hours. The parties do not dispute that this medication is used to control pain. Maxitrol ointment had been placed in plaintiff's right eye at surgery and an eye dressing was placed over the eye with instructions not to remove it until plaintiff was seen the following morning. All parties agree that Maxitrol ointment contains an antibiotic and is used to prevent infection.

On November 11, 1992, plaintiff was seen at the RIH Eye Clinic by Dr. Petashnik who prescribed Maxitrol ointment for the right eye four times per day. On November 12, 1992, Dr. Bansal ordered Maxitrol ointment for plaintiff four times per day and regular Tylenol tabs four times per day when necessary.

Plaintiff returned to the RIH Eye Clinic on November 16, 1992. At that time, Dr. Petashnik continued the order for Maxitrol ointment and added Lacrilube and artificial tears four times per day. Plaintiff was given samples. On November 23, 1992, plaintiff was again seen at the RIH Eye Clinic and his vision was determined to be 20/20, and the right eye was healing well. Dr. Petashnik ordered a continuation of the Maxitrol ointment, Lacrilube and tears. On November 24, 1992, a telephone order was received from Dr. Vorasingha, an ACI staff physician, and recorded by defendant DiGuilio. This order was for a continuation of Maxitrol four times per day and for Hypo Tears four times per day. On December 11, 1992, Maxitrol

---

1. A winglike structure, especially an abnormal triangular fold of membrane in the interpalpebral fissure, extending from the conjuctiva to the cornea. Dorland's Medical Dictionary, 24th Ed., 1989.

ointment and artificial tears were again ordered four times per day for 10 days by the DOC medical staff and plaintiff was referred to the RIH Eye Clinic. On December 17, 1992, plaintiff was seen at the RIH Eye Clinic where he complained he did not receive Maxitrol ointment the previous week. Dr. Petashnik again found plaintiff's vision to be 20/20 and that the right eye was "healed well" without evidence of any recurrence. Figueroa was released from care to return only as necessary. Dr. Petashnik did not order any further medications.

Plaintiff returned to the RIH Eye Clinic on April 20, 1993 complaining of irritation in his right eye. There was a small recurrence of pterygium. The plaintiff was prescribed Naphcon A eye drops and Dr. Petashnik stated he needed eyeglasses.

During early 1993, plaintiff was being treated by the ACI medical staff for dry skin and a left ankle condition. On April 6, 1993, Dr. Bansal again ordered artificial tears and Lacrilube four times per day for plaintiff's right eye. This order was repeated on May 3, 1993 for 30 days. On May 20, 1993, plaintiff was referred to the ACI staff optometrist, Dr. Harrison Smiley, for a vision check which occurred on May 27, 1993. Dr. Smiley examined plaintiff's eyes and found vision in the right eye to be poor at 20/50 and in the left eye to be normal at 20/20. He opined that he did not feel eyeglasses were indicated as they would not help plaintiff's vision deficit.

The ACI medical staff continued to order artificial tears and Naphcon A eye drops to be given four times per day and referred plaintiff to the RIH Eye Clinic on October 7, 1993.

Plaintiff was seen at the RIH Eye Clinic on November 5, 1993. At that time plaintiff was noted to have the same vision defect in his right eye with the same recommendation for eyeglasses. In addition, plaintiff had developed an eyebrow lesion over his right eye unrelated to his prior pterygium condition. Lastly, plaintiff was noted to have pterygium in his left eye but this was asymptomatic. A referral for a dermatology consult for the eyebrow lesion was recommended. The DOC medical staff did refer plaintiff to the

Regan Skin Clinic on November 18, 1993, but due to scheduling conflicts, plaintiff was not seen until February 14, 1994. At that time, Dr. Alper diagnosed the problem as seborrheic dermatitis/eczema and prescribed Nizoral cream and Hytone Lotion 2.5% twice per day for 30 days.

On plaintiff's return to the ACI, the medical staff ordered these medications for plaintiff, but, for some unexplained reason, the medications were not provided to plaintiff at that time. Plaintiff was again seen at the Regan Skin Clinic on April 18, 1994 shortly after plaintiff began receiving his prescribed creams. Plaintiff's condition was "better," and Dr. Alper prescribed a continuation of the creams. Plaintiff was seen again at the Regan Skin Clinic on May 23, 1994 where Dr. Alper found the lesion "worse" and recommended referral to an ophthalmologist for a biopsy. He also continued the use of Hytone lotion 2.5% twice per day. On that day, plaintiff was referred to the Surgical Clinic by the DOC medical staff (Dr. Bansal), and on June 8, 1994, plaintiff was scheduled to be seen at the RIH Eye Clinic for the biopsy. Due to lack of transportation, plaintiff was not seen. Another appointment was scheduled for June 10, 1994, but this also had to be cancelled because of medical emergencies at the ACI. Plaintiff was seen at the RIH Eye Clinic on June 14, 1994, and the physician stated "no area to biopsy per ophthalmic etiology. F/U with dermatology if does not heal." There are no further records from either the RIH Eye Clinic or the Regan Skin Clinic.

On July 15, 1994, Dr. Bansal examined plaintiff and ordered continuation of the Hytone lotion.

In November, 1993, DOC provided plaintiff with eyeglasses even though there was a dispute between Dr. Petashnik and Dr. Smiley over their effectiveness. Plaintiff produced his eyeglasses at time of trial and offered them into evidence. I declined to receive them but did note that plaintiff was able to function and read all exhibits without the use of these glasses.

The DOC Nursing Contact Notes and Medication Sheets for plaintiff were admitted

into evidence and demonstrate that as early as November 19, 1992, plaintiff received an explanation of the medication procedure for ordinary medication and that prescribed by outside consultanting doctors. Testimony from defense witnesses indicated that once plaintiff was returned to the ACI, he became a patient of the DOC medical staff who had to approve all prescribed medications by outside consultanting doctors. Without DOC medical staff approval, no medications could be given to plaintiff. There has been no showing that any defendant refused to approve any medications prescribed by an outside consultant. The Nursing Contact Notes document several complaints from plaintiff concerning his medications and subsequent meetings to resolve these concerns. At various times, plaintiff did not appear at sick call to obtain his medications or refused to appear. In September, 1993 and again in May, 1994, on several occasions, plaintiff refused to see Dr. Smiley, the staff optometrist. Also on several occasions in May, 1994, plaintiff did not appear at the Dispensary for his eye medications. The Medication Sheets show plaintiff received his eye medications as ordered when he came to the Dispensary. At times, certain medications were given to the inmate for self-administration including artificial tears, Lacrilube, Naphcon A, Nizoral Cream and Hytone Lotion. At other times the medications were given by the DOC nursing staff.

On many and diverse occasions, plaintiff filed written complaints concerning his medical care. These complaints were sent to defendant Marocco, Hugh Guerin, R.N., Supervisor of Nurses, Alfred Leach, Warden of Maximum Security and defendant Vose. Almost without exception, a response was made to each written complaint attempting to explain medical procedures to plaintiff. At times, members of the DOC medical staff met with plaintiff to explain medical procedures and medications.

At trial, plaintiff testified he did not receive his prescribed medications as ordered. Records of the DOC staff refute this testimony. Plaintiff also testified he was told by defendants Bansal, DiGuilio and Brown that there would be no medical treatment from them due to this lawsuit being filed. DOC medical records refute this, as Dr. Bansal continued to treat plaintiff well after this lawsuit was filed both for this eye condition and other unrelated medical problems. Nurses DiGuilio and Brown continued to provide nursing services and medications to plaintiff following the filing of this lawsuit.

At trial, plaintiff called several witnesses on his behalf. Steward Joseph DeCurtis testified he had no knowledge as to whether plaintiff received his medications. He overheard plaintiff complain about the outside physicians but not the DOC medical staff. When plaintiff complained about his eye, DeCurtis sent him to the Maximum Security Dispensary.

Correctional Officer Alfred Lancellotti was called to testify by plaintiff. He worked at Maximum Security in 1992–1993 in the Dining Room where the med-line would be located. He was asked to verify that on April 23 and 24, 1993, plaintiff was in the med-line for his eye medications and the nurse stated that there was none for plaintiff. Lancellotti not only failed to verify this incident, but stated he was on vacation in Florida that week. Personnel records of Lancellotti ordered produced by this court verify that Lancellotti was on vacation on April 23 and 24, 1993.

Next plaintiff called a fellow inmate, Juan Morejon, to testify. Morejon was an inmate with plaintiff at High Security in late 1992 and early 1993. Morejon testified he was present in Block A when plaintiff returned from the outside hospital following eye surgery and heard plaintiff state he had terrible pain in his eye and ask for some pain medication. Such medication was refused. According to Morejon, plaintiff was denied pain medication 3 or 4 times over a 3 day period, during which time plaintiff was locked in his cell.

Lastly, plaintiff called for testimony Thomas Marra, Jr., a fellow inmate at Maximum Security in the summer of 1993. Marra testified that he was present at the Maximum Security Dispensary at sometime in the summer of 1993 when certain legal documents were served by the plaintiff on the defendants. He further testified Dr. Bansal and nurse Brown were present, became upset

and stated that they were not going to provide additional medical care to plaintiff. Marra testified that all medications were denied to plaintiff that day.

Defendant DiGuilio testified that she provided medical care to plaintiff at the High Security facility in late 1992. Plaintiff was returned to the ACI following his November 10, 1992 surgery while DiGuilio was on duty. She received a telephone order from Dr. Chang, an ACI staff physician, for Tylenol # 3 with codeine every four hours for 24 hours. Plaintiff received one dose at 8 p.m. on med-line. Medication records show Tylenol # 3 was also given on November 11, 1992 at 8 a.m., 12 noon and 4 p.m. The November 10, 1992 dose and the 4 p.m. dose on November 11, 1992 were given plaintiff by nurse DiGuilio and the remaining two doses were given plaintiff by nurse Messa. Maxitrol ointment was provided commencing November 12, 1992 at 8 p.m. and on November 13, 1992 by nurse DiGuilio and on November 14, 1992 and thereafter by nurses Langlois, Miller and others.

On November 21, 1992, a tube of Maxitrol ointment was given to plaintiff by nurse Messa, and at various times on November 24, 25 and 26, 1992, Maxitrol ointment was given by nurse DiGuilio. On December 11, 1992, Dr. Chang re-ordered Maxitrol ointment for 10 days. This was provided to plaintiff during that time by nurse DiGuilio and nurses Langlois, Miller and Achille. There were occasions during this 10 day period when plaintiff did not receive his Maxitrol ointment either because he refused it or did not come to the med-line. During the months of January, February and March, 1993, plaintiff was receiving other medications for an allergy condition. In January, 1993, plaintiff was transferred from High Security to Maximum Security and nurse DiGuilio no longer provided any medical care to him. Nurse DiGuilio explained how the med-line operates—a nurse with a medicine cart visits each Module at the facility and is announced to the inmates who come to the door for their medications. If an inmate is in lockup, then the nurse will go to that cell. If an inmate is in segregation, he can be brought to the Dispensary if he makes the necessary arrangements with the correctional officers in charge.

Colleen Cappezza, a registered nurse and, for the past 7 years, Director of Nurses at DOC, testified that she was familiar with plaintiff and corresponded with plaintiff concerning his medical complaints. Nurse Cappezza explained how inmates receive medical attention. If an outside doctor is involved, a medical furlough form is completed by a nurse and signed by the referring ACI staff physician. The form is also signed by the Health Program Administrator, the Deputy Assistant Director of Rehabilitation Services or the Assistant Director for Adult Services. The outside doctor then completes the form as to the date of the exam, the results thereof and any recommendations and/or prescriptions. This form is returned to the ACI with the inmate and reviewed by an ACI staff physician or nurse and the necessary treatment and/or medication orders made. There are 5 full-time physicians at the ACI plus several part-time and consulting physicians. Inmates are required to have 2 correctional officers accompany them on medical furloughs for security purposes. Often visits are scheduled or re-scheduled depending on availability of correctional officers and transportation.

Nurse Cappezza reviewed plaintiff's medical records and noted the numerous occasions when plaintiff was brought to the RIH Eye Clinic and the Regan Skin Clinic. She spoke with the Maximum Security nursing staff and was satisfied that all nurses were performing appropriately and professionally. She checked doctor's orders and deliveries from the pharmacy. She further noted that on several occasions plaintiff received medications to be self-administered. Nurse Cappezza did advise her nurses not to provide any further medications to plaintiff for self-administration but to require him to come to the med-line or dispensary so there would be more control and documentation as to these medications.

Nurse Marion Brown, a defendant, testified that she worked at Maximum Security in January, 1993 and provided nursing care to plaintiff. On occasion, Nurse Brown provided medications to plaintiff. She denied ever

refusing to provide medications to plaintiff or witnessing any other medical personnel refusing medications to plaintiff. There were times when plaintiff did not receive his medications, but this was because plaintiff did not come to the med-line. If the med-line was missed, it was up to the inmate to go to the Dispensary for medications. If an inmate was in segregation, a correctional officer would escort the inmate to the Dispensary or, on occasion, the nurse would visit the segregation unit. It was the responsibility of the inmate to obtain his medications. Nurse Brown stated that she was often in the segregation unit and plaintiff never requested her to provide eye drops or ointment. Records of the DOC show that plaintiff was in the segregation unit for 30 days in April, 1994 and for 10 days in June, 1994. Medication records show that for most of April 1994, plaintiff received Nizoral Cream and Hytone Lotion 2.5% twice per day, and during June, 1994, plaintiff received Hydrocortisone Lotion. It is not clear where those medications were given.

Records of the ACI pharmacy requested by this court show that in November and December, 1992, Maxitrol ointment and artificial tears were sent to High Security for plaintiff's use. During 1993, the pharmacy sent Sudafed, Entex–LA, TLC Lotion, artificial tears, lubricating eye ointment, Naprosyn and Naphcon–A eye solution to Maximum Security for plaintiff's use on many occasions. In 1994, to date, the pharmacy has supplied for plaintiff's use Hytone lotion and Nizoral cream.

Plaintiff's main contentions are that he was not provided his medications as ordered by the physicians, was denied medical care by the ACI medical staff and was not timely referred to outside physicians as required. As a result, plaintiff alleges that these defendants exhibited deliberate indifference to his medical needs in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff seeks compensatory and punitive damages along with any further relief necessary to protect plaintiff's constitutional rights.

## Discussion

### A. Legal Standard.

"Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulations, custom, or usage, of any State or Territory....'" *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982). In order to be successful in presenting a § 1983 claim, a plaintiff must prove the existence of a federal constitutional or statutory right and a deprivation of that right by a person acting under color of state law. *Watterson v. Page,* 987 F.2d 1, 7 (1st Cir.1993).

Here, Figueroa charges that defendants, acting under color of state law, have deprived him of medical treatment and care or, at least, adequate medical treatment and care, in violation of his rights guaranteed under the Eighth and Fourteenth Amendments to the United States Constitution. The Fourteenth Amendment makes the Eighth Amendment applicable to state actors. *Des-Rosiers v. Moran,* 949 F.2d 15, 17 (1st Cir. 1991).

The Eighth Amendment prohibits "cruel and unusual punishment." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). This covers more than just "physically barbarous punishments." *Id.* Repugnant to the Eighth Amendment are punishments which are "incompatible with 'the evolving standard of decency that mark the progress of a maturing society,'" *id.* at 102, 97 S.Ct. at 290 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)), which "involve the unnecessary and wanton infliction of pain," *id.* at 103, 97 S.Ct. at 290 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)), and which are grossly disproportionate to the severity of the crime, *id.* at 103, n. 7, 97 S.Ct. at 290, n. 7.

■ In compliance with these principles, the government has an obligation to provide medical care for inmates. *Id.* at 103–106, 97 S.Ct. at 290–92. Where, as here, an inmate

claims that state prison officials have withheld essential health care in violation of the Eighth Amendment, he must prove such action amounted to "deliberate indifference to a serious medical need." *Id.* at 106, 97 S.Ct. at 292. "Deliberate indifference is conduct that offends evolving standards of decency in a civilized society." *DesRosiers v. Moran,* 949 F.2d at 18. The indifference must be deliberate and not inadvertent or negligent. *Wilson v. Seiter,* 501 U.S. 294, 301, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1990); *Ferola v. Moran,* 622 F.Supp. 814, 820 (D.R.I.1985).

In order to establish deliberate indifference, the complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. The requisite state of mind may be manifested by the officials' response to an inmate's known needs or by denial, delay or interference with prescribed health care. While this mental state can aptly be described as "recklessness," it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.

*DesRosiers v. Moran,* 949 F.2d at 19 (citations omitted).

■ I find that Figueroa's eye condition (pterygium), surgery and post-operative care created a serious medical need. I also find, however, that these defendants did not act with deliberate indifference thereto. Certainly these defendants (Bansal, DiGuilio and Brown) provided plaintiff at least adequate medical care and, in my opinion, medical care at a much higher level. Plaintiff's claims that his general medical needs were not met, because he did not receive medications, did not receive timely medical furloughs to outside physicians and was denied medical care, simply are unsupported by the testimony and exhibits in this matter. While it is true that some referrals to the outside physicians were delayed, reasons given were lack of availability of correctional officers and/or transportation, a scheduling mix-up and court appearances. Missed medications are explained by confusion in ordering appropriate medicine, plaintiff refusing his medications, plaintiff not appearing for his medications or plaintiff being given tubes of medication for self-administration. Although plaintiff claims that at least two defendants (Bansal and Brown) stated they would provide no further medical attention to plaintiff because of this lawsuit, the medical records are replete with evidence that defendants Bansal and Brown did provide medical care after this lawsuit was filed, not only for plaintiff's eye condition but for his other unrelated medical problems. I find that these defendants did not withhold medical care from plaintiff. To do so would not only be inappropriate but also highly unprofessional. I do not find any evidence that these defendants acted in a highly unprofessional manner. Also, plaintiff has not met his burden of showing any injury from delayed medical furloughs or missed medications. There is no evidence that the visits with these clinics were less frequent than necessary or that any lack of visits resulted in damage or injury to plaintiff. Without an injury, there cannot be an award of damages.

This dispute arose because plaintiff believed his specific medical needs were not being appropriately and timely addressed. The medical records do not support plaintiff's belief. Between September 22, 1992 and June 14, 1994, Figueroa was seen 9 times at the RIH Eye Clinic. At no time did any physician at the RIH Eye Clinic indicate in the clinic records that plaintiff was not being seen at frequent enough intervals or that his medical care at the ACI was below standard.

From February 14, 1994 to May 23, 1994, plaintiff was seen at the Regan Skin Clinic on 3 occasions, again without any statement by a physician that these visits were at less than required intervals. On at least 2 occasions, plaintiff refused a visit to the ACI staff eye doctor.

Defendant DiGuilio provided medical care to plaintiff during a 2 month period—November, 1992 to January, 1993. The Nursing Contact Notes reflect 3 entries written by Nurse DiGuilio and the Medication Sheets reflect that Nurse DiGuilio gave plaintiff his prescribed medications on 16 different occasions. This record is barren of any evidence Nurse DiGuilio engaged in conduct amounting to deliberate indifference.

■ As to defendants Vose and Marocco, it is clear that they are sued in their supervisory capacity. Plaintiff has offered no proof that Vose and/or Marocco committed any acts or omissions amounting to a reckless or callous indifference to his constitutional rights. In order to show supervisory liability, the supervisor must be liable on the basis of his own acts or omissions and not just on a theory of *respondeat superior*. *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87 (1st Cir.1994). Plaintiff has failed to demonstrate any separate acts of these defendants amounting to deliberate indifference to his medical needs.

There is no evidence that any defendant in this matter acted with a culpable state of mind and intended wantonly to inflict pain on plaintiff. To the contrary, from November, 1992 to present, defendants Bansal, DiGuilio and Brown continued to fulfill their obligation to meet plaintiff's general medical needs as presented to them and during their working hours. There is substantial evidence that plaintiff had several unrelated medical needs during this time frame (knee, dry skin, back and allergies); all of which were treated in part by these defendants. Plaintiff has not alleged or proven deliberate indifference as to this medical treatment. It is inconceivable that these defendants would on one hand attend satisfactorily to some of plaintiff's general medical needs but be deliberately indifferent to a specific medical need (his eye) with intent to inflict pain on him. If defendants had the requisite state of mind to be deliberately indifferent to plaintiff's medical needs concerning his eye, it is puzzling why they would not be inattentive to all his medical needs and not just a specific one.

[A]n inmate deserves *adequate* medical care, he cannot insist that his institutional host provide him with the most sophisticated care that money can buy.

\* \* \* \* \* \*

[T]his obligation [to afford decent health care] is met in full measure by the provision of adequate services: services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.

*United States v. DeCologero*, 821 F.2d 39, 42–43 (1st Cir.1987).

Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.

*Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987).

There is no evidence, other than plaintiff's testimony, that he received no medical care or medical care so inadequate as to shock the conscience. All medical records introduced into evidence totally refute plaintiff's testimony, including the records of the Clinics themselves. While plaintiff did not, on occasion, obtain his medication on a timely basis and missed Clinic visits, there is no evidence that such deficiencies were caused by defendants' recklessness. Indeed, at times, plaintiff refused his medications or did not appear at the med-line. Transportation problems and non-availability of correctional officers caused certain clinic visits to be rescheduled. But prescribed medications were generally available to plaintiff and Clinic visits were rescheduled and kept. Figueroa has failed to present any evidence of a serious medical need that has gone unmet.

■ As the First Circuit has stated, "a claim of inadequate medical treatment which reflects no more than a disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment." *DesRosiers v. Moran*, 949 F.2d at 20. This is all we have here, a difference in opinion over what constitutes appropriate medical care to be afforded plaintiff.

■ I do not reach or consider any question of negligence or medical malpractice since neither amounts to a constitutional violation. *Estelle v. Gamble*, 429 U.S. at 106, 97 S.Ct. at 292. By stating this I do not mean to imply there is negligence or malpractice. My intent is only to state that I have searched this record for a violation of the Eighth Amendment and have found none.

508

Judgment shall enter for the defendants. So ordered.