Ronald W. BREWER, Plaintiff,

v.

Dr. Leonard BLACKWELL; Martha Van Baale; Dr. Martin E. Farbstein; and Correctional Medical Systems, Defendants.

No. 4–90–CV–30745.

United States District Court,
S.D. Iowa, C.D.

Oct. 26, 1993.

**632**

Ronald W. Brewer, pro se.

Bruce C. McDonald of Dickey, Smith, Kultala & McDonald, Keokuk, IA, for defendants.

MEMORANDUM OPINION and ORDER

BENNETT, United States Magistrate Judge.

TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ... 633
II. FACTUAL FINDINGS ... 633
III. BREWER'S EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM
 A. An Overview of the Eighth Amendment ... 637
 B. Deliberate Indifference to a Serious Medical Need ... 637
 1. Introduction ... 638
 2. Deliberate Indifference—The Objective and Subjective Components ... 638
 a. Introduction ... 639
 b. The Objective Component ... 639
 c. The Subjective Component ... 641
IV. ANALYSIS: INCLUDING FINDINGS OF ULTIMATE FACT ... 643
V. CONCLUSION ... 644

Plaintiff, Ronald W. Brewer is an inmate at the Iowa Mens Penitentiary ("ISP") in Fort Madison, Iowa. Brewer suffers from coronary artery disease. In this 42 U.S.C. § 1983 litigation, Brewer asserts that the failure of the Defendants to prescribe medications recommended by consulting physicians at the University of Iowa Hospital and Clinics constitutes deliberate indifference to his serious medical needs and therefore violates the Eighth Amendment's prohibition on cruel and unusual punishment. The Defendants are a Missouri corporation, two physicians licensed to practice medicine in Iowa, and a nurse each of whom provide medical care to inmates at ISP.

## I. INTRODUCTION AND BACKGROUND.

On December 31, 1990, Brewer commenced a *pro se* complaint against Dr. Leonard Blackwell and Martha Van Baale. On the same date, Judge Donald E. O'Brien issued an initial review order granting Plaintiff Brewer permission to proceed in forma pauperis pursuant to 28 U.S.C. § 1915(d), denying his application for a temporary restraining order, and appointing counsel to represent Brewer after consideration of the factors in *In re Lane*, 801 F.2d 1040, 1043–44 (8th Cir.1986). Counsel subsequently appeared on behalf of Brewer, engaged in rather extensive discovery and, on September 9, 1991, Chief Magistrate Judge Bremer granted Brewer's amendment to the complaint. The amendment added Dr. Farbstein and Correctional Medical Services ("CMS") as Defendants. The amended complaint alleges that the Defendants violated Brewer's Eighth Amendment rights by denying him medications recommended by the University of Iowa Hospitals & Clinics ("UIHC") on September 9, 1990 and again on July 1, 1991.

On January 25, 1993, Brewer's counsel was allowed to withdraw and Brewer proceeded *pro se*. After consenting to a United States magistrate judge pursuant to 28 U.S.C. § 636(c), this matter proceeded to trial on June 7, 1993. Brewer appeared *pro se* and the Defendants were represented by Bruce C. McDonald of Dickey, Smith, Kultala & McDonald, Keokuk, Iowa. The case was very well tried by both sides. Brewer was well prepared and his conduct during trial demonstrates that, through preparation and diligence, *pro se* inmate plaintiffs can adequately and effectively represent themselves.

## II. FACTUAL FINDINGS.

Plaintiff, Ronald W. Brewer, is an inmate at the Iowa State Penitentiary ("ISP") and has been incarcerated in the Iowa State penal system for approximately thirty years. At all times relative to this litigation, Brewer has suffered from coronary artery disease. On May 9, 1989, Brewer was seen in the cardiology clinic of UIHC and received a diagnosis of "one vessel coronary artery disease, status post inferior myocardial infarction, one vessel coronary artery disease with occluded right coronary artery in 1988."

At all times material to this litigation Defendant CMS, a Missouri corporation, was under contract with the State of Iowa to provide medical services to inmates at ISP. CMS does not engage in the practice of medicine and exercised no control over the medical judgments, opinions, actions or decisions made by Drs. Blackwell and Farbstein regarding Brewer's medical care and treatment.

Dr. Martin E. Farbstein is a medical doctor licensed to practice in the State of Iowa and was the physician at ISP from April through October, 1991. On February 20, 1991, Dr. Farbstein entered into a written letter agreement with CMS to provide medical coverage at ISP. Dr. Farbstein was not employed by CMS but rather worked at ISP as an independent contractor for CMS.

Dr. Leonard Blackwell is a physician licensed by the State of Iowa. On October 27, 1988, he entered into an Independent Contract Physicians Agreement with ARA

Health Services, Inc. d/b/a Correctional Medical Systems, Inc., a Missouri corporation, to provide medical services at ISP. Dr. Blackwell was not employed by CMS but rather worked at ISP as an independent contractor for CMS. Dr. Blackwell left ISP during the latter part of April, 1991.

In September, 1990, Defendant Martha Van Baale worked as a registered nurse at ISP. Van Baale had no authority to prescribe medications to Brewer. The record evidence does not indicate any affiliation between Van Baale and Defendant CMS.

During 1989, 1990 and 1991, Brewer's coronary artery disease was followed by Drs. Blackwell and Farbstein as well as consulting physicians at UIHC. On May 13, 1989, following an evaluation of Brewer in the cardiology clinic at UIHC, the consulting physician, Dr. Sanders, wrote Dr. Blackwell the following letter:

Dear Doctor:

Ronald Brewer was seen in the Cardiology Clinic on May 9, 1989, with a diagnosis of one vessel coronary artery disease, status post inferior myocardial infarction, one vessel coronary artery disease with occluded right coronary artery in 1988.

This 49 year old white male returns for follow-up. His current medications include Isordil 40 mg PO QID, Ecotrin one BID, Diltiazem 60 mg QID, Persantine 75 mg BID, Tenormin 50 mg PO q AM. He has been doing fairly well and has an excellent exercise tolerance with no significant chest discomfort. He has occasional symptoms of lightheadedness/orthostasis after taking Diltiazem.

Physical examination revealed a blood pressure of 120/70 and pulse 65. He was a well developed white male in no acute distress. The chest was clear. Cardiovascular exam revealed normal sinus rhythm with normal S1 and S2 and no murmur or gallop. The abdomen was benign.

Electrocardiogram showed normal sinus rhythm and Q's in II, III and F, no change.

The patient is generally doing well. We suggest stopping the Persantine but continuing with ASA. We will have him decrease the Diltiazem to 30 mg QID and consider discontinuing altogether if he continues to do well. A return appointment will be scheduled for one year.

Sincerely,

Jeffrey Sanders, M.D.

Staff

Division of Cardiovascular Diseases

Brewer was again seen in the cardiology clinic of UIHC on September 10, 1990. On September 12, 1990, the UIHC consulting physician in the division of Cardiovascular Diseases, Dr. Weiss, wrote Dr. Blackwell the following letter concerning Brewer's follow-up visit:

Dear Doctor:

Your patient was seen in the Cardiology Clinic on September 10, 1990, with the diagnosis of coronary artery disease, status post inferior myocardial infarction in 1988.

Mr. Brewer returns for scheduled follow-up visit today. In the interim he has had infrequent angina—approximately once every two weeks. This is not associated with exertion, emotional upset, or meals. It is unusually promptly relieved with Nitroglycerin. He has had no dyspnea on exertion, no orthopnea, edema, palpitations, or syncope. His medications are Isordil 40 mg TID, aspirin 1 BID, Diltiazem 60 mg QID, Persantine 75 mg BID, and Atenolol 50 mg PO QAM.

The physical exam today revealed a blood pressure of 146 by palpation, pulse 80 and regular, and respirations 18 and unlabored. Jugular venous pressure was 8 cm of water. The lungs were clear. The cardiac exam was notable for a normal S1 and S2 without murmurs of gallops. The abdomen and extremities were unremarkable.

The EKG is pending at this time.

Assessment: Mr. Brewer is doing relatively well status post inferior wall myocardial infarction. Because of his infrequent angina, we will increase his Diltiazem to 90 mg

PO QID. Other medications will remain the same. We will schedule a follow-up visit for him in approximately one year. Thank you for allowing us to participate in the care of your patient, Mr. Ronald W. Brewer. Please call me if you would like to discuss his care further.

Sincerely,

Robert Weiss, M.D.

Staff

Division of Cardiovascular Diseases

(319) 356-0483

Dr. Weiss was mistaken when he assumed Brewer was currently taking Diltiazem 60 mg four times per day.[1] This reference to Brewer's medications in Dr. Weiss' September 12, 1990 correspondence to Dr. Blackwell was in error. Believing that Brewer was already taking 60 mg of Diltiazem four times per day, Dr. Weiss, in his September 12, 1990 letter to Dr. Blackwell, recommended an increase in Diltiazem to 90 mg four times per day. Dr. Weiss did not recommend an increase in any other of Brewer's medications.[2]

On September 18, 1990, after reviewing Dr. Weiss' recommendations, Dr. Blackwell entered the recommendations as orders for Brewer's prescriptions. Dr. Blackwell's prescription orders of September 18, 1990, in the ordinary course of procedures at the ISP Hospital, were sent to Steven Helling, the pharmacist at ISP. In reviewing Dr. Blackwell's September 18, 1990 prescription order for Brewer, Helling realized Brewer was not currently taking Diltiazem. Helling was concerned about starting Brewer on a dosage of 90 mg four times per day. Helling checked the Physicians Desk Reference, the standard "Bible" for pharmacists and physicians regarding prescriptions, and confirmed that the typical beginning dosage for Diltiazem is 30 mg four times per day. Due to Helling's concern about possible adverse effects on

starting Brewer on such a high dosage of Diltiazem, he contacted Dr. Blackwell. As a result of this contact, both Helling and Blackwell concluded that Brewer should start on 30 mg of Diltiazem twice each day.

On September 20, 1990, Dr. Blackwell telephoned Dr. Weiss to discuss Blackwell's belief that Dr. Weiss had made an erroneous assumption regarding Brewer's Diltiazem prescription. Dr. Weiss concurred in Dr. Blackwell's modification of Dr. Weiss' suggested Diltiazem dosage. Brewer's medical records indicate he was informed of Dr. Weiss' error and Dr. Blackwell's modification of Dr. Weiss' recommendation on November 15, 1990, by nurse Druppel.

On December 17, 1990, Dr. Blackwell increased Brewer's prescription for Diltiazem from 30 mg two times per day to 30 mg four times per day. This was partially in response to Brewer's complaints of continued angina pain.

On March 7, 1991, Brewer indicated to Dr. Blackwell that while he was still experiencing some chest pain, it was less severe. Dr. Blackwell again ordered an increase in Diltiazem to 60 mg four times per day.

On July 1, 1991, Brewer was again seen at the cardiology clinic at UIHC by Dr. Charles R. McKay, a physician in the Division of Cardiovascular Diseases. On July 3, 1991, Dr. McKay wrote Dr. Farbstein the following letter:

> To whom it may concern:
>
> Ronald Brewer was seen in the Cardiology Clinic on July 1, 1991.
>
> The patient is a 52 year old inmate who is status post inferior myocardial infarction in 1985 with chronic stable angina. He has waxing and waning anginal symptoms on medications. He smokes approximately one-half pack per day. He is active in the prison, walking two miles per day, bicy-

---

1. Diltiazem is the generic name for the more common drug Cardizem. Diltiazem is a calcium ion influx inhibitor (slow channel blocker or calcium antagonist). Physicians Desk Reference 1291 (45th ed. 1991). While the precise mechanisms of its antianginal actions are still being explored, it is believed that Diltiazem "produces relaxation of coronary vascular smooth muscle and dilation of both large and small coronary

arteries …" with "resultant increases in coronary blood flow…." *Id.* at 1293.

2. At this time, in September of 1990, Brewer was on the following medications: Isordil 40 mg TID, aspirin 1 BID, Persantine 75 mg BID and Atenolol 50 mg PO QAM.

cling, using weights and Steermaster. [sic] He does not experience angina after these, but does experience some chest pain after mild exercise or after sitting quietly in the evening. The angina is typical left pressure chest pain without radiation or associated cardiopulmonary of transient nature and usually relieved by further rest. Therefore, in one sense, he does not have progressive, true, exertional angina, but has some possible anxiety-related chest pain with an anginal component which we would classify as an atypical angina.

On physical examination, he is a well-developed, middle-aged male with a blood pressure of 140/90. The chest is clear. Cardiac examination shows an S4 gallop at the apex; S1 and S2 are normal; there are no murmurs; peripheral pulses are full. The impression is that he has atypical angina, but does have a history of coronary artery disease. We would only perform a cardiac catheterization in this patient when is clearly refractory to medical management. An exercise treadmill test would not be helpful, because we know now that he has coronary artery disease. At the time when he appears to be refractory to medical management, and we are looking for objective evidence to then pursue cardiac catheterization, we would try to document the ischemia on a treadmill on medication. We are not approaching that point with this patient, however.

I believe increasing his anti-anginal medications which are now at mild to moderate doses is appropriate. Therefore, we could sequentially increase his Atenolol from 50 mg a day to 50 mg b.i.d., the Cardizem from 60 mg q.i.d. to 90 or 120 mg q.i.d., and the Isordil from 40 mg t.i.d. to 80 mg t.i.d. When we reach these levels of medication, he may persist in being symptomatic. Further workup would only then be indicated. We would expect to see him on an annual or biannual referral basis, or earlier should you deem it necessary.

Thank you very much for allowing us to participate in the continuing care of this patient. Please call if you would like to discuss his care further.

Sincerely,

Charles R. McKay, M.D.
Staff
Division of Cardiovascular Diseases
(319) 356-8276

On July 1, 1991, Dr. McKay made handwritten recommendations on Brewer's medical referral records regarding increasing Brewer's Cardizem *or* Isordil. The July 3, 1991 typewritten letter to Dr. Farbstein, which postdated the handwritten recommendations, recommended increasing Cardizem *and* Isordil.

On July 1, 1991, Dr. Farbstein entered prescription orders for Brewer based upon the handwritten recommendations of Dr. McKay. On July 3, 1991 Dr. Farbstein entered a note on Brewer's medical records observing Brewer's recent low blood pressures. Dr. Farbstein indicated that he was prescribing nitrostat for Brewer to address his angina complaints, rather than increasing Tenormin and Cardizem, to avoid adverse effects on Brewer's blood pressure. Dr. Farbstein's decision not to increase Brewer's Cardizem level, following his July 1, 1991 evaluation at UIHC was out of concern for Brewer's low blood pressure.

On August 13, 1991, Dr. Farbstein reviewed Brewer's medications and noted that Brewer appeared to be doing well on the dosages prescribed on July 1, 1991.

Dr. Farbstein consulted with Brewer on August 19, 1991 concerning his decision not to increase Brewer's Cardizem dosage. Dr. Farbstein indicated in Brewer's medical records that he did not increase Brewer's Cardizem because of his concern for Brewer's blood pressure. On August 30, 1991, an evaluation of Brewer's blood pressure revealed that his blood pressure was well controlled under Dr. Farbstein's prescription regimen.

Brewer persisted in his request for more Cardizem and on September 13, 1991, physicians assistant Diane Carter telephoned Dr. McKay at UIHC. Dr. McKay recommended maintaining Brewer's prescriptions at their current dosages, based upon Dr. Farbstein's concern and Brewer's current medical condition.

Brewer has failed to prove by a preponderance of the evidence that any of the actions by Dr. Blackwell or Dr. Farbstein were the result of or motivated by an effort to reduce the cost of medications at ISP.

## III. BREWER'S EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM.

### A. An Overview of the Eighth Amendment

To better understand and evaluate the merits of Brewer's claim of deliberate indifference to a serious medical need, a brief overview of Eighth Amendment jurisprudence is helpful. The Eighth Amendment prohibition of "cruel and unusual punishments" has its origin in English law.[3] *Furman v. Georgia*, 408 U.S. 238, 316, 92 S.Ct. 2726, 2765, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring). Prior to the adoption of the English Bill of Rights in 1689, a prohibition against "excessive punishments in any form" had developed in English common law over the centuries. *See* Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Cal. L.Rev. 839, 844–47 (1969). The language used in the Eighth Amendment first appeared in the 1689 English Bill of Rights, which was drafted by Parliament and ratified at the accession of the new monarchs, William and Mary. *Gregg v. Georgia*, 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976) (citing Granucci, *supra,* at 852).[4] In 1776, Virginia adopted verbatim this language from the English Bill of Rights in its own Declaration of Rights. *Furman*, 408 U.S. at 319, 92 S.Ct. at 2767 (Marshall, J., concurring). Eight other states soon adopted this clause, and in 1791 it became the Eighth Amendment to the United States Constitution. Granucci, *supra*, at 840.

In an analysis of the original meaning of the Eighth Amendment's "cruel and unusual" punishment clause, the Supreme Court recognized that:

[t]he English version appears to have been directed against punishments unauthorized by statute and beyond the jurisdiction of the sentencing court, as well as those disproportionate to the offense involved.... The American draftsmen ... were primarily concerned, however, with proscribing 'tortures' and other 'barbarous' methods of punishment.

*Gregg*, 428 U.S. at 169–70, 96 S.Ct. at 2923 (joint opinion) (citing Granucci, *supra*, at 842, 860); *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). The Eighth Amendment was adopted with the intention of placing limits on the government and the potential abuse of its power against persons convicted of crimes. *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989).

The earliest Eighth Amendment claims before the Supreme Court "focused on particular methods of execution to determine whether they were too cruel to pass constitutional muster." *Gregg*, 428 U.S. at 170, 96 S.Ct. at 2923 (citing *Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345 (1878); *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890)). In these early cases, the Court restricted its Eighth Amendment inquiry to whether the methods of execution were torturous or barbarous within the Amendment's original meaning. *Estelle*, 429 U.S. at 102, 97 S.Ct. at 290. The Court, however, "has not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner." *Gregg*, 428 U.S. at 171, 96 S.Ct. at 2924. In *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), the Supreme Court moved away from a historical interpretation of the Eighth Amendment and stated: "Time works changes, [and] brings into existence new conditions and purposes. Therefore a principle to be vital must be

---

**3.** The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (emphasis added).

**4.** "The tenth declaratory clause of the bill reads: 'That excessive bail ought not to be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted.'" Granucci, *supra,* at 852–53 (citation omitted).

capable of wider application than the mischief which gave it birth. This is particularly true of constitutions." *Weems,* 217 U.S. at 373, 30 S.Ct. at 551. The Court went on to point out that the Eighth Amendment's cruel and unusual punishments clause has an "expansive and vital character," which "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by human justice." *Id.* at 377, 378, 30 S.Ct. at 553; *see also Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) ("[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society"); *Gregg,* 428 U.S. at 172–73, 96 S.Ct. at 2925 ("the Eighth Amendment has not been regarded as a static concept"); *Estelle,* 429 U.S. at 102–03, 97 S.Ct. at 290 ("the Amendment proscribes more than physically barbarous punishments"); *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968) ("broad and idealistic concepts of dignity, civilized standards, humanity, and decency" help define the Eighth Amendment proscriptions).

"[P]ublic perceptions of standards of decency with respect to criminal sanctions are not conclusive." *Gregg,* 428 U.S. at 173, 96 S.Ct. at 2925. A penalty must also comply with the "dignity of man." *Id.* (quoting *Trop,* 356 U.S. at 100, 78 S.Ct. at 597). The punishment "must not involve the unnecessary and wanton infliction of pain [or] ... be grossly out of proportion to the severity of the crime." *Id.* (citations omitted). "Until recent years, [however,] the Cruel and Unusual Punishment Clause was not deemed to apply at all to deprivations that were not inflicted as part of the sentence for a crime." *Hudson v. McMillian,* —— U.S. ——, ——, 112 S.Ct. 995, 1005, 117 L.Ed.2d 156 (1992) (Thomas, J., dissenting). The Eighth Amendment was not considered to protect inmates from harsh treatment by prison officials. *Id.* "It was not until 1976—185 years after the Eighth Amendment was adopted—that [the] Court first applied it to a prisoner's complaint about a deprivation suffered in prison." *Id.* at ——, 112 S.Ct. at 1006. In *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), the Supreme Court extended the application of the cruel and unusual punishment clause to

inmate deprivations which were not part of an inmate's sentence. *Hudson,* —— U.S. at ——, 112 S.Ct. at 1001; *Wilson v. Seiter,* —— U.S. ——, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991).

### B. Deliberate Indifference to a Serious Medical Need

#### 1. Introduction

In *Estelle,* the court broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. The court recognized that the Eighth Amendment proscribed more than just physically barbarous punishments by noting that the Eighth Amendment "embodied broad and idealistic concepts of dignity, civilized standards, humanity and decency...." *Estelle,* 429 U.S. at 102, 97 S.Ct. at 290 (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)). The court observed that punishments which are incompatible with society's evolving standards of decency or which involve the unnecessary and wanton infliction of pain violate the Eighth Amendment. *Estelle,* 429 U.S. at 102–03, 97 S.Ct. at 290.

The court relied on these principles in establishing a constitutional obligation for the government to provide prisoners medical care. The court recognized that inmates must rely on prison authorities to treat his medical needs; if the authorities fail to do so the prisoner will not receive any medical care. *Id.* at 103, 97 S.Ct. at 290. In the worst cases a failure to give adequate medical care may produce physical torture or a lingering death which clearly constitutes violations of the Eighth Amendment. *Id.* In less serious cases a denial of medical care may result in pain and suffering which does not serve a penological purpose. *Id.* The court concluded by holding that deliberate indifference to serious medical needs of prisoners constituted the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Id.* at 104, 97 S.Ct. at 291. Mindful of the historical context of Eighth Amendment cruel and unusual punishment jurisprudence, the court now turns to Brewer's cruel and unusual punishment claim that Dr. Blackwell, Dr. Farbstein, Nurse Van Baale and CMS' actions consti-

tute deliberate indifference to a serious medical need.

### 2. Deliberate Indifference—The Objection and Subjective Components

#### a. Introduction

 In order to make out a successful claim of deliberate indifference to serious medical needs Brewer must meet the objective and subjective components of an Eighth Amendment violation. *Wilson v. Seiter,* — U.S. —, —, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). The objective component concerns whether an alleged deprivation is sufficiently serious enough to constitute an Eighth Amendment violation. *Id.* The objective component in a case where the prisoner is claiming inadequate medical care is met when the prisoner proves that his medical need is serious. *Hudson v. McMillian,* — U.S. —, —, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). The subjective component looks to whether a prison official acted with the requisite culpable state of mind to be considered as acting with a deliberate indifference to a prisoner's medical needs. *Id.* The culpable state of mind of deliberate indifference is shown if the prison officials deliberately deprive a prisoner of adequate medical care in response to a serious medical need or act recklessly in response to such a need.[5] Brewer must successfully carry his burden of proof on both of these elements to establish a successful claim of deliberate indifference. *Helling v. McKinney,* — U.S. —, — — —, 113 S.Ct. 2475, 2479–80, 125 L.Ed.2d 22 (1993).

#### b. The Objective Component

 The objective component of an Eighth Amendment claim has its roots in contemporary standards of decency. *Hudson,* — U.S. at —, 112 S.Ct. at 1000. Thus to meet the objective component, Brewer must prove conduct by Defendants Blackwell, Farbstein or Van Baale which is adverse to social standards of decency. *Id.* In

the context of a prisoner's claim of inadequate medical care, society does not expect that prisoners will have unqualified access to health care. *Id.* In order to offend contemporary standards of decency, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if the needs are serious. *Id.*

 Several federal court decisions provide significant guidance in determining whether Brewer suffers from a serious medical need. A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991); *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *West v. Keve,* 571 F.2d 158, 162–63 n. 6 (3rd Cir.1978); *Johnson v. Vondera,* 790 F.Supp. 898, 900 (E.D.Mo.1992); *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H. 1977). Federal courts have frequently found that medical needs of prisoners which require surgery constitute serious medical needs and when combined with deliberate indifference shown by prison officials constitute an Eighth Amendment violation. *See e.g., Johnson v. Lockhart,* 941 F.2d 705 (8th Cir.1991) (inguinal hernia); *Warren v. Fanning,* 950 F.2d 1370 (8th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 111, 121 L.Ed.2d 68 (1992) (toenails which had become infected and had turned black); *Dace v. Solem,* 858 F.2d 385 (8th Cir.1988) (painful nasal condition); *Toombs v. Bell,* 798 F.2d 297 (8th Cir.1986) (painful gallstones); *Taylor v. Bowers,* 966 F.2d 417 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992) (ruptured appendix); *Mandel v. Doe,* 888 F.2d 783 (11th Cir.1989) (fracture in the hip joint which required surgery).

Federal courts have also found many physical medical needs which do not require sur-

---

**5.** See *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984); *Branchcomb v. Brewer,* 669 F.2d 1297, 1298 (8th Cir.1982); *Miller v. Solem,* 728 F.2d 1020, 1024 (8th Cir.1984); *Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir.1990); *Benson v.* *Cady,* 761 F.2d 335, 339 (7th Cir.1985); *Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985); *Des Rosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991).

gery to be sufficiently serious to satisfy the objective component of an Eighth Amendment claims. *See e.g., Fields v. Gander,* 734 F.2d 1313 (8th Cir.1984) (infected teeth); *Mullen v. Smith,* 738 F.2d 317 (8th Cir.1984) (back and head injuries which prohibited prisoner from walking); *Miltier,* 896 F.2d at 852 (repeated complaints of chest pains, headaches, and dizziness which later resulted in prisoner's death); *Green v. Carlson,* 581 F.2d 669 (7th Cir.1978) (severe asthmatic attack which led to prisoner's death); *Payne v. Lynaugh,* 843 F.2d 177 (5th Cir.1988) (severe emphysema which required the use of oxygen equipment); *Bunton v. Englemyre,* 557 F.Supp. 1 (E.D.Tenn.1981) (broken hand).[6]

It is also important to note that to meet the objective component Brewer need not prove he has a *current* serious medical need. The Supreme Court recently held that a prisoner states a cause of action under the Eighth Amendment if he alleges that prison officials, with deliberate indifference, exposed the inmate to levels of environmental tobacco smoke "that pose an unreasonable risk of serious damage to his future health." *Helling,* ─── U.S. at ───, 113 S.Ct. at 2481.[7] The Court rejected the defendant's central thesis that only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment. *Id.* at ───, 113 S.Ct. at 2477. Finally, the Court remanded the case "to provide an opportunity for McKinney to prove his allegations, which will require him to prove both the subjective and objective elements necessary to prove an Eighth Amendment violation." *Id.* at ─── ─ ───, 113 S.Ct. at 2481–82.[8]

Many claims of inadequate medical care have failed to meet the objective component by failing to prove that the prisoner had a serious medical need. *See e.g., Wesson v. Oglesby,* 910 F.2d 278, 284 (5th Cir.1990) (swollen wrists are not a serious medical need); *Shabazz v. Barnauskas,* 790 F.2d 1536, 1538 (11th Cir.1986) (prisoner's sensitive skin condition caused by shaving was not a serious medical need); *Johnson v. Vondera,* 790 F.Supp. 898, 900 (E.D.Mo.1992) (headaches, neck pain and blurred vision did not establish a serious medical need for whirlpool treatments); *Ashford v. Barry,* 737 F.Supp. 1, 3 (D.D.C.1990) (being kicked in the leg does not establish a serious medical need); *Tyler v. Rapone,* 603 F.Supp. 268, 271–72 (E.D.Pa.1985) (prisoner's claim failed because he admitted his need for dental care and treatment for a cut were not serious medical needs); *Borrelli v. Askey,* 582

---

**6.** The principle that the medical need must be serious is not limited to physical needs but also extends to an inmate's mental health care needs. *Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir.1990). Psychological disorders may constitute a serious medical need. *White v. Farrier,* 849 F.2d 322, 325 (8th Cir.1988); *Young v. Armontrout,* 795 F.2d 55 (8th Cir.1986); *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). Thus prisoners have successfully proven that transsexualism is a serious medical need. *White,* 849 F.2d at 325; *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). Similarly an inmate who was diagnosed as a schizophrenic with suicidal tendencies was determined to have a serious medical need in *Greason v. Kemp,* 891 F.2d 829, 835–36 (11th Cir.1990).

**7.** Other cases have held that an unreasonable risk to future health are actionable under the Eighth Amendment. *Glick v. Henderson,* 855 F.2d 536, 539–40 (8th Cir.1988) (prisoner would state a colorable claim under § 1983 if he could show there is a pervasive risk of harm to inmates of contracting the AIDS virus and a failure of prison officials to reasonably respond to that risk); *Todaro v. Ward,* 565 F.2d 48, 51 (2d Cir.1977) (prison officials subjected inmates to grave and unnecessary risks, prison officials need not wait until an epileptic chokes on her tongue to act); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir.1990) (involuntary exposure to a prison cell containing asbestos constitutes a claim of deliberate indifference to serious medical needs, the fact that the plaintiff was requesting preventative treatment does not make his medical need not to breathe asbestos any less serious).

**8.** In *McKinney,* the Court clarified what McKinney was required to prove regarding the objective component of his Eighth Amendment claim. The Court stated that McKinney must: (1) prove he is currently being exposed to the unreasonable risk to his future health; (2) make a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by the risk; and (3) demonstrate that the risk is not one that today's society chooses to tolerate. *McKinney,* ─── U.S. at ───, 113 S.Ct. at 2482.

F.Supp. 512, 513 (E.D.Pa.1984) (slight visual impairment causing mild headaches and mild tension is not a serious medical need); *Griffin v. DeRobertis,* 557 F.Supp. 302, 306 (N.D.Ill.1983) (while aches and sore throats may not constitute serious medical needs, becoming ill to the point of.spitting up blood does.)

■ Prisoners' claims have also failed when there is no cure or treatment for the alleged serious medical need. *Bailey v. Gardebring,* 940 F.2d 1150, 1155 (8th Cir.1991), *cert. denied* by *Bailey v. Noot,* —— U.S. ——, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992) (prisoner's claim he was deprived of psychiatric care geared towards sexual offenders failed because there was no cure or generally accepted method of treatment for the prisoner's condition); *Warren v. Missouri,* 995 F.2d 130, 131 (8th Cir.1993) (since physical therapy would not have improved prisoner's wrist injury, prisoner did not have a serious medical need for such therapy); *Johnson,* 790 F.Supp. at 900 (since whirlpool treatments would not have cured prisoner's neck pain, headaches and blurred vision, the failure to implement such medically unnecessary treatment does not rise to the level of deliberate indifference). A condition for which there is no known or generally recognized method of treatment cannot serve as a predicate for the conclusion that failure to provide treatment constitutes "deliberate indifference to the serious medical needs of prisoners." *Bailey,* 940 F.2d at 1155 (quoting *City of Canton v. Harris,* 489 U.S. 378, 397, 109 S.Ct. 1197, 1209, 103 L.Ed.2d 412 (1989) (O'Connor, J., concurring))..

### c. The Subjective Component

The subjective component of an Eighth Amendment claim requires that Brewer prove Defendants Blackwell, Farbstein and Van Baale acted with a sufficiently culpable state of mind. An intent requirement is implicit in the Eighth Amendment proscription of cruel and unusual punishment, and acts which are accidental or inadvertent do not constitute punishment and do not violate the Eighth Amendment.[9] It is obduracy and wantonness, not inadvertence or error in good faith that characterize the conduct prohibited by the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). "If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting official before it can qualify as an Eighth Amendment violation." *Wilson v. Seiter,* —— U.S. ——, —— – ——, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991).

■ The requisite state of mind in a case where a prisoner is alleging inadequate medical care is that prison a official must act with deliberate indifference. *Id.* at —— – ——, 111 S.Ct. at 2326–27 (deliberate indifference constitutes wanton conduct prohibited by the Eighth Amendment). Brewer must allege and prove acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92. It is only through such indifference that the Eighth Amendment can be implicated. *Id.* Deliberate indifference may be shown by prison official's attitude and conduct in response to a prisoner's serious medical need. *McKinney,* —— U.S. at —— – ——, 113 S.Ct. at 2479–80; *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291–92; *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991); *DeGidio v. Pung,* 704 F.Supp. 922, 955 (D.Minn.1989).

Federal courts have held that deliberate indifference is shown if prison officials deliberately deprive a prisoner of medical care where there is a serious medical need or act

---

9. "The infliction of punishment is a deliberate act intended to chastise or deter.... [I]f [a] guard accidently stepped on [a] prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word, whether we consult the usage of 1791, or 1868 or 1985." *Wilson,* —— U.S. at ——, 111 S.Ct. at 2325 (quoting *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985)). Similarly, the court in *Estelle* stated it is not unconstitutional to subject a prisoner to a second attempt to execute him after a mechanical malfunction thwarted the first attempt. *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291 (citing *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947)). The malfunction was an accident and did not constitute the wanton and unnecessary infliction of pain prohibited by the Eighth Amendment. *Id.*

recklessly in the face of such a serious medical need. *Martin,* 742 F.2d at 474; *Branchcomb v. Brewer,* 669 F.2d 1297, 1298 (8th Cir.1982); *Miller v. Solem,* 728 F.2d 1020, 1024 (8th Cir.1984), *cert. denied,* 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984) (prison officials may be liable either because they actually intended to deprive the prisoner of some constitutional right or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates); *Miltier,* 896 F.2d at 851 (deliberate indifference may be shown by actual intent of reckless disregard); *Benson,* 761 F.2d at 339 (a plaintiff must prove deliberate indifference either by actual intent or reckless disregard); *Duckworth v. Franzen,* 780 F.2d 645, 652–54 (7th Cir.1985) (infliction of suffering on prisoners violates the Eighth Amendment only if the infliction is either deliberate or reckless in the criminal sense); *DesRosiers,* 949 F.2d at 19 (required state of mind that shows deliberate indifference can be met through deliberate acts and recklessness).

■ Recklessness in the face of a serious medical need occurs if the prison officials disregard a substantial risk of danger that is known or would be apparent to a reasonable person in the prison official's position. *Buckner v. Hollins,* 983 F.2d 119, 122 (8th Cir. 1993); *Benson,* 761 F.2d at 339; *Miltier,* 896 F.2d at 851; *DesRosiers,* 949 F.2d at 19. Thus, Brewer must present sufficient evidence that the trier of fact could conclude that the official acted with deliberate indifference. *Buckner,* 983 F.2d at 122–23 ("failure to intervene in order to stop Buckner's beating, particularly when Buckner was naked, hand-cuffed, and defenseless, would provide an ample basis for a jury to conclude that

Veltrop acted with deliberate indifference ...").[10]

■ However, a plaintiff must establish more than ordinary negligence on the part of prison authorities in responding to his medical needs to establish a claim of medical mistreatment under the Eighth Amendment. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085; *Franzen,* 780 F.2d at 652–53 (Ordinary negligence and even 'gross negligence' are not enough). Treatment may violate the Eighth Amendment only if it involves something more than a medical judgment call, an accident, or an inadvertent failure to give medical care. *Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir.1990); *see also Murrell v. Bennett,* 615 F.2d 306, 310 n. 4 (5th Cir.1980). A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084; *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292; *Taylor,* 966 F.2d at 421; *DesRosiers,* 949 F.2d at 19; *Miltier,* 896 F.2d at 851–52; *DeGidio,* 704 F.Supp. at 955; *Benson,* 761 F.2d at 339. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Simply showing that another doctor in similar circumstances might have ordered different treatment only raises questions about medical judgment and does not show that the physician acted with deliberate indifference. *Noll v. Petrovsky,* 828 F.2d 461, 462 (8th Cir.1987), *cert. denied,* 484 U.S. 1014, 108 S.Ct. 718, 98 L.Ed.2d 668 (1988). Many complaints of inadequate medical care fail because the prisoner has failed to prove that the prison official acted with a culpable mind greater than negligence. *Es-*

---

10. The Seventh Circuit has taken a different position on the issue of what constitutes recklessness. In *Duckworth v. Franzen,* the subjective knowledge of the prison official is viewed as the determinative factor. 780 F.2d 645, 652–53. The Seventh Circuit in *Franzen,*

> looked to the criminal law, which typically uses subjective mental standards, and held that recklessness violates the eighth amendment only if the prison official had "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it."

*McGill v. Duckworth,* 944 F.2d 344, 348–49 (7th Cir.1991) (quoting *Franzen,* 780 F.2d at 653). The Seventh Circuit holds to the *Franzen* decision, and its subjective knowledge requirement. *Id.* Thus, in order to prevail on a deliberate indifference claim, the inmate "'must demonstrate something approaching a total unconcern for his welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm.'" *King v. Fairman,* 997 F.2d 259, 261 (7th Cir. 1993) (quoting *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992) (citations omitted)).

*telle,* 429 U.S. at 107, 97 S.Ct. at 292 (whether an x-ray and different forms of treatment should have been given for prisoner's back injury at most constituted negligence); *Bellecourt v. United States,* 994 F.2d 427, 431 (8th Cir.1993) (the fact that prison doctor misdiagnosed the prisoner's condition and his method of physical examination and treatment may not have followed community standards does not amount to deliberate indifference); *DesRosiers,* 949 F.2d at 19–20 (prison official's failure to give prisoner assistance with bandage changes and suggested number of showers following surgery at worst amount to some specie of carelessness); *Benson,* 761 F.2d at 341 (prisoner's allegations that prison physicians failed to give him prescribed medications and a cervical collar for his neck injury constituted a claim of negligence).

It is important to note, however, that a claim of deliberate indifference is not disproved merely by showing that a physician diagnosed or treated a prisoner. *Smith,* 919 F.2d 90, 93 (8th Cir.1990). When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all, or that which may constitute recklessness, may amount to deliberate indifference. *Mandel,* 888 F.2d at 789 (although an inmate physician assistant saw the prisoner on numerous occasions the assistant never notified a doctor of the prisoner's injury and never obtained an x-ray). Diagnosis or treatment which is grossly incompetent or so deviates from professional standards of conduct can rise to the level of deliberate indifference. *Smith,* 919 F.2d at 93 (court reversed summary judgment when district court had failed to look into the medical records of the prisoner and had done no exploration into the standard of care for terminating the prisoner's medication); *Warren v. Fanning,* 950 F.2d 1370, 1373 (8th Cir. 1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 111, 121 L.Ed.2d 68 (1992).

## IV. *ANALYSIS: INCLUDING FINDINGS OF ULTIMATE FACT.*

Brewer's coronary artery disease is a serious medical need. Serious medical needs have been defined as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991). It is uncontested that Brewer's coronary artery disease is sufficiently serious so as to constitute a severe medical need for Eighth Amendment purposes.

The United States Court of Appeals for the Eighth Circuit has "repeatedly held that a prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail to rise to the level of a constitutional violation." *Taylor v. Bowers,* 966 F.2d 417, 421 (8th Cir.1992) *cert. denied sub nom. Bowers v. Taylor,* —— U.S. ——, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992); *DesRosiers,* 949 F.2d at 20 (prisoner disagreed with the established practice of having prisoners change their own bandages and thought he should have been given more showers); *Smith v. Marcantonio,* 910 F.2d 500, 502 (8th Cir.1990) (prisoner's disagreements on location of rehabilitation for burn injuries, amounts of pain medication, and frequency of bandage changes failed to state deliberate indifference); *Taylor v. Turner,* 884 F.2d 1088, 1090 (8th Cir.1989) (prisoner's disagreement about treatment for mental deficiency, surgery for hernia, hearing deficiency, and nutritional deficiency found insufficient); *Lair v. Oglesby,* 859 F.2d 605, 606 (8th Cir.1988) (mere disagreement about which medication should have been prescribed does not constitute an Eighth Amendment violation); *Martin v. Sargent,* 780 F.2d 1334, 1339 (8th Cir.1985) (prisoner's disagreement about treatment of pain in his lower back and arm did not constitute an Eighth Amendment violation); *Randall v. Wyrick,* 642 F.2d 304, 308 (8th Cir.1981) (mere disagreement over diagnosis and medication involving back and joint pain did not constitute an Eighth Amendment violation); *Cognato v. Ciccone,* 558 F.2d 512 (8th Cir. 1977), *cert. denied,* 434 U.S. 974, 98 S.Ct. 530, 54 L.Ed.2d 465 (1977) (prisoner's disagreement over medication did not raise a claim under the Eighth Amendment, however, subjective responses of the inmate may be a factor in considering a claim of deliberate indifference); *Massey v. Hutto,* 545 F.2d 45,

644

46 (8th Cir.1976) (disagreement over physical abilities of inmate did not constitute an Eighth Amendment violation); *Seward v. Hutto*, 525 F.2d 1024, 1024–25 (8th Cir.1975) (prisoner's disagreement over diagnosis did not state an Eighth Amendment claim); *see also Estelle*, 429 U.S. at 107, 97 S.Ct. at 292 (prisoner's claims that he should have received x-ray and other tests for back injury found insufficient); *Czajka v. Caspari*, 995 F.2d 870, 871 (8th Cir.1993) (prisoner's disagreement with prison doctor about delaying surgery found insufficient).

■ The thrust of Brewer's deliberate indifference allegations relates to the Defendants' failure to follow precisely the recommendations of the consulting physicians of the Division of Cardiovascular Diseases as UIHC. The first recommendation by Dr. Weiss of UIHC on September 10, 1990 was not followed due to Dr. Weiss' misunderstanding that Brewer was already on Diltiazem. Dr. Blackwell, in consultation with the ISP pharmacist Helling, started Brewer on a lower dosage of Diltiazem and gradually increased it. There is no evidence of wanton or deliberate indifference to Brewer's condition by Dr. Blackwell, only an attempt to rectify a misunderstanding without jeopardizing Brewer's health.

The second incident involves Dr. Farbstein's alleged failure to follow Dr. McKay's (another Division of Cardiovascular Diseases physician at UIHC) recommendation to increase Brewer's dosages. Again, while Dr. Farbstein does not precisely follow Dr. McKay's recommendations, he does so based upon his own professional medical judgment and not as the result of any deliberate indifference towards Brewer's condition.

Finally, Brewer failed to offer any evidence at trial that Martha Van Baale, the registered nurse at ISP, in any way took any action which constitutes deliberate indifference to Brewer's serious medical needs.

Because the court finds that none of the Defendants' conduct rises to a level of deliberate indifference to Brewer's serious medical needs, the Eighth Amendment right prohibiting cruel and unusual punishment has not been violated. Thus, the court has no occasion to reach Defendant CMS's claim

that it cannot be held vicariously liable for the acts of the individual Defendants under 42 U.S.C. § 1983; nor need the court reach the individual Defendants' claims of qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) and its progeny.

## V. CONCLUSION.

Brewer suffers from coronary artery disease which is a serious medical need. However, for the reasons stated in this opinion, the Defendants' alleged failure to follow the recommendation of the consulting physicians at the University of Iowa Hospitals and Clinics does not constitute deliberate indifference to Brewer's serious medical needs. Brewer has therefore failed to establish a violation of the Eighth Amendment's prohibition of cruel and unusual punishment. Judgment shall be entered for the Defendants Blackwell, Farbstein and Van Baale and Brewer's complaint is dismissed.

**IT IS SO ORDERED.**