Melvin v. Brodeur, Comm'r          CV-97-192-SD  12/8/98
                UNITED STATES DISTRICT COURT FOR THE

                    DISTRICT OF NEW HAMPSHIRE


David Melvin


        v.                                Civil No. 97-192-SD


Paul Brodeur, Commissioner,
  New Hampshire Department of
  Corrections;
Michael Cunningham, Warden,
  New Hampshire State Prison;
Michael Sokolow, Protective
  Custody Unit Manager,
  New Hampshire State Prison


                         O R D E R


        Pro se plaintiff David Melvin, an inmate at the New

Hampshire State Prison (NHSP), brings this civil rights action

pursuant to 42 U.S.C. § 1983.  He claims that the defendants,

Paul Brodeur, Commissioner of the New Hampshire Department of

Corrections; Michael Cunningham, Warden of NHSP; and Michael

Sokolow, Protective Custody Unit Manager at NHSP, acting under

color of state law, deprived him of his constitutional rights by

transferring him within the Protective Custody Unit (PCU) from

NHSP's E-Pod to its F-Pod.  In addition to a state-law claim of

negligence, Melvin claims that by improperly classifying him

under the Quay system, defendants violated the Laaman Consent Decree and his Eighth Amendment rights.

Presently before the court is defendants' motion for summary judgment, to which plaintiff objects. For the reasons that follow, this court grants defendants' motion in its entirety.

Background

In 1989 Melvin was convicted of aggravated felonious sexual assault for the rape of his 15-year-old daughter. Upon his incarceration, he was classified under the Quay system[1] as "Normal", which allowed him to be housed with inmates who were classified as either "Aggressors" or "Prey". In October 1991 his rape offense was incorrectly recorded during an administrative review, which resulted in his being incorrectly classified[2] as

---

[1]The Quay classification system was developed in accordance with a Consent Decree issued in Laaman v. Helgemoe, 437 F. Supp. 269, 329 (D.N.H. 1977), to facilitate the separation of vulnerable inmates from aggressive ones. The Consent Decree is a settlement agreement between NHSP prisoners and prison officials regarding various living conditions within NHSP. This court approved the amended version of this decree on July 20, 1990. The amended version is currently the subject of an unrelated action.

[2]An inmate's offense is considered when determining his or her Quay classification. According to the Quay system, plaintiff's rape offense should have been recorded as a violent crime. Instead, his offense was incorrectly recorded as an "other sexual offense," which changed his overall classification from Normal to Prey.

2

Prey. Despite several administrative reviews between 1991-1995, prison officials failed to correct this classification mistake. In March 1995 plaintiff was classified as Normal, even though his rape conviction was still not properly recorded. Finally, in October 1996 Melvin's rape conviction was properly recorded, and he was appropriately classified as Normal under the Quay classification system.

Beginning in July 1995 Melvin lived in E-Pod of the PCU, which was composed of two pods, E-Pod and F-Pod. Inmates in F-Pod are generally more aggressive than those in E-Pod.[3] On March 21, 1997, defendant Sokolow, the PCU manager, informed plaintiff that he was being transferred to F-Pod for security reasons. Defendants allege that Melvin's transfer was necessary because other inmates had informed officials that he was operating an underground canteen in E-Pod, which officials believed posed an unacceptable risk of violence in that pod. Plaintiff objected to this transfer[4] and informed Sokolow that in 1990 two inmates in F-Pod, Pete Provencher and Leon Evans, had threatened to stab him. Despite this alleged threat, Sokolow

_____

[3]Inmates with Quay classifications of Normal and Predator live in F-Pod, while inmates with Quay classifications of Normal and Prey live in E-Pod.

[4]In March 1992 plaintiff had requested a transfer to F-Pod, but was denied.

3

knew, based upon his own observation[5] and discussion with plaintiff, that Melvin had not had any other difficulty with these men while in the PCU. Sokolow informed Melvin that he would still be transferred to F-Pod, but would not be placed in a room with either of the inmates who had threatened him.

Over a period of two months, Melvin filed a series of grievances regarding his living conditions. Except for the first grievance, all of these complaints were filed after his transfer to F-Pod. On February 15, 1997, before the transfer, Melvin filed a grievance alleging that Correctional Officer Gregory Barnett improperly reviewed plaintiff's mail. On March 9, 1997, Sokolow informed plaintiff that he would talk to Officer Barnett to correct this problem. On March 23, 1997, shortly after his transfer to F-Pod, plaintiff filed a grievance with defendant Cunningham claiming that he was living in fear on F-Pod. After discussing the issue with Sokolow, on March 26, 1997, Cunningham responded, informing Melvin that officials had a good reason for placing him in F-Pod and did not believe he was in danger. On April 2, 1997, plaintiff filed another grievance with defendant Brodeur claiming that he was in danger and that he was unfairly

---

[5]Under staff supervision, inmates from E-pod and F-Pod interact during combined activities of the two pods, such as mealtimes.

4

being forced to dispose of his property.[6]  After discussing plaintiff's grievance with Sokolow, Brodeur responded on April 4, 1997, informing Melvin that he had been on F-Pod for some time without incident, that Sokolow was watching the situation closely, and that officials had properly instructed plaintiff to dispose of his excess property.

Also on April 4, 1997, Melvin filed a request to see a mental health counselor claiming that he was under a lot of stress, he lived in fear for his safety, and he did not know how much longer he could live like this.  A NHSP mental health counselor, Roman Aquizap, visited Melvin on April 7, 1997. Plaintiff claims that Aquizap was going to try to get him returned to E-Pod to prevent the Vietnam flashbacks Melvin had experienced since his transfer to F-Pod.

On April 9, 1997, Melvin filed a grievance with the prison librarian claiming that an inmate working at the library had made an extra copy of one of his grievances, that this extra copy was circulating through F-Pod, and that this circulation was causing plaintiff problems on F-Pod.  On April 17, 1997, the librarian informed Melvin that his complaint would be investigated.

---

[6]Plaintiff had filed an earlier grievance on March 25, 1997, with defendant Cunningham complaining that Sokolow had forced him to dispose of some of his property.  Cunningham responded to this grievance on April 2, 1997.

On April 9, 1997, Melvin also wrote a letter to his pod officer, Mr. Gauthier, stating that he had the following four problems on F-Pod: (1) on his first day on F-Pod "twenty dollars worth of canteen" was stolen from him; (2) an extra copy of one of his grievances was circulating through the pod, causing him problems with other F-Pod inmates; (3) his roommate had been approached by unidentified inmates who had requested his roommate's help in robbing plaintiff; and (4) an unnamed person told plaintiff he would get seriously hurt unless he put a carton of cigarettes and a bag of coffee by a specific cell at a designated time. As of February 1998, no one had informed Warden Cunningham of this letter.

On April 20, 1997, Melvin sent a second grievance to Aquizap, the mental health counselor, complaining of persistent Vietnam flashbacks as a result of his transfer to F-Pod. After discussing the issue with Sokolow, on May 9, 1997, Aquizap informed plaintiff that Sokolow had not observed any complications with plaintiff and that plaintiff should make an effort to get along with the other inmates in F-Pod. Although Aquizap also invited plaintiff to come visit him in the mental health unit if plaintiff's distress continued, plaintiff asserts that this option was not available to him because of his status as a PCU inmate.

On April 23, 1997, Melvin filed another grievance with Sokolow regarding the disposal of his personal property. Sokolow responded to plaintiff on April 28, 1997, emphasizing that it was more than fair to force plaintiff to send his excess property out of the prison, when officials could have confiscated it instead.

On April 30, 1997, Melvin had a tooth extracted, which he claims was necessitated by his being punched by an unidentified F-Pod inmate approximately one week prior to the extraction. One month later, on May 22, 1997, plaintiff reported the assault to Corrections Officer Robert Drew. Melvin then informed Officer Drew of three additional problems he was having with other F-Pod inmates: (1) inmate William Hallinan had stolen property from him; (2) inmates, one of whom he believed to be Lawrence Hamilton, were extorting property from him; and (3) inmates Jonathan Conklin and Ronald Jacques robbed him the previous night, which caused him to stay awake all night to plan how he could kill them. With this information, prison officials placed Melvin on administrative review status and moved him to the Secure Housing Unit (SHU) that day. Plaintiff remained in the SHU for eight days during the unit investigation,[7] and then was

---

[7]To protect himself from alleged abuse by other inmates, plaintiff sought injunctive relief while he lived in NHSP's SHU. After an evidentiary hearing on May 27, 1997, the court denied plaintiff's motion for injunctive relief. See Order of June 2, 1997.

moved to E-Pod on the PCU, where he remained without incident until NHSP dissolved its entire Protective Custody Unit. He was then moved, with his permission, into the general population of the prison[8] in June 1998. Other than continuing to experience Vietnam flashbacks, plaintiff has lived without incident within NHSP's general population.

Melvin has been treated by a mental health professional for the last eight months regarding his Vietnam flashbacks and nightmares. Inmates who lived with plaintiff before his transfer to F-Pod claim that he did not experience Vietnam flashbacks before the transfer. Inmates who have lived with Melvin since his transfer to F-Pod have observed plaintiff experiencing these flashbacks.

Melvin and another NHSP inmate, Daniel Leaf, claim that NHSP officials have routinely sent inmates from E-Pod to F-Pod as punishment for making complaints against the establishment. Plaintiff claims he did not threaten other inmates on E-Pod, nor did he have a history of misconduct on E-Pod that would justify his transfer to F-Pod. Instead, Melvin claims that officials, knowing he would be robbed and physically and mentally abused by

_____

[8]Plaintiff claims that even though he wanted to remain in the PCU, he did not want to move with the unit into another prison with inmates he didn't know, and therefore he signed the waiver to be transferred to NHSP's general population.

8

other inmates on F-Pod, moved him to F-Pod in retaliation for his initial grievance against Officer Barnett. To the contrary, defendants allege that plaintiff was only transferred to F-Pod because of their suspicions that he was operating an illegal canteen operation on E-Pod, which was a potential threat to security.

## Discussion

### 1. Standard of Review

The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Accordingly, at this stage of the proceeding, the court does not weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue of fact for trial. See Stone & Michaud Ins. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The substantive law identifies which facts are material so that "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" Caputo v. Boston Edison Co., 924 F.2d 11, 12-13 (1st Cir. 1991) (quoting Anderson, supra, 477 U.S. at 248).

The party seeking summary judgment bears the initial burden of establishing the lack of genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), cert. denied, 484 U.S. 1066 (1988); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). As a result, the court must view the entire record in the light most favorable to the non-moving party, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). Additionally, the court must read this plaintiff's complaint and other pleadings with an extra degree of care in light of his pro se status. See Estelle v. Gamble, 429 U.S. 97, 106 (1976), reh'g denied, 429 U.S. 1066 (1977). However, once a defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, supra, 477 U.S. at 256.

## 2.  42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, litigants such as plaintiff can bring civil actions against any government official "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ."  42 U.S.C. § 1983 (1994).  As the basis for this section 1983 action, Melvin alleges three constitutional violations: (1) defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by transferring him to F-Pod, when they knew other F-Pod inmates posed a serious risk of danger to him; (2) defendants violated his Fourteenth Amendment rights by transferring him to F-Pod as punishment without due process; and (3) defendants violated the Laaman Consent Decree and his Eighth Amendment rights by improperly classifying him under the Quay System.

Defendants allege, inter alia, that, to the extent they are sued in their official capacities, they are not "persons" subject to suit under 42 U.S.C. § 1983.  See Defendants' Motion for Summary Judgment.  It is true that the defendants cannot be sued under section 1983 in their official capacities.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989); Wilson v.

Brown, 889 F.2d 1195, 1197 (1st Cir. 1989) (court dismissed section 1983 claim when prisoner sought monetary damages against warden in his official capacity). On the other hand, plaintiff has brought this suit against these defendants, not only in their official capacities, but in their individual capacities as well. Thus, as individuals who act under color of state law, these defendants would qualify as "persons" from whom the plaintiff may recover under section 1983. See Hafer v. Melo, 502 U.S. 21, 27 (1991) ("officers sued in their personal capacity [in a section 1983 suit] come to the court as individuals . . . [and] thus fit[] comfortably within the statutory term 'person'").

### a. Eighth Amendment

It is inappropriate for this court to consider whether defendants violated the Laaman Consent Decree. First, "[n]ot every breach of prison regulations will give rise to an Eighth Amendment claim." DesRosiers v. Moran, 949 F.2d 15, 21 (1st Cir. 1991). Moreover, "[a] consent decree is negotiated by the parties [who agree to it] and may be extremely detailed and provide relief far beyond constitutional requirements." DeGidio v. Pung, 920 F.2d 525, 534 (8th Cir. 1990). As a result, not only would governmental authorities be discouraged from entering into such decrees if violations were actionable under section

12

1983, but it would also be unfair to the parties to the consent decree if the courts engaged in this type of analysis. See id. Accordingly, the appropriate action for enforcement of a consent decree is not a section 1983 action, but an action for contempt. See Martel v. Fridovich, 14 F.3d 1, 3 n.4 (1st Cir. 1993) (citing DeGidio, supra, 920 F.2d at 534; Green v. McKaskle, 788 F.2d 116, 1123 (5th Cir. 1986)).

According to the Eighth Amendment, government officials[9] may not inflict cruel and unusual punishment upon individuals. See U.S. CONST. amend. VIII. Specifically, it is official punishments that are incompatible with "'the evolving standards of decency'" of a modern society which violate the Eighth Amendment. See Estelle, supra, 429 U.S. at 102 (quoting Trop v. Dulles, 356 U.S. 86, 100-01 (1958)).

Under the Eighth Amendment, prison officials do have a duty to protect prisoners from other prisoners who are violent; if officials "intentionally place prisoners in dangerous surroundings" or "are 'deliberately indifferent' either to prisoners' health or safety, they violate the Constitution." Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988), cert. denied, 488 U.S. 823 (1988) (prison officials

_____

[9]The Eighth Amendment is applicable to state officials through the Fourteenth Amendment. See Robinson v. California, 370 U.S. 660, 666, reh'g denied, 371 U.S. 905 (1962).

13

violated Eighth Amendment when they were deliberately indifferent to health and safety needs of psychiatric inmate killed in overcrowded prison).  The standard of deliberate indifference requires the court to engage in a two-part inquiry which has an objective component and a subjective component.  See DesRosiers, supra, 949 F.2d at 18.

To satisfy the objective component, a plaintiff must show that defendants' actions resulted in a "sufficiently serious deprivation" to the plaintiff.  See DesRosiers, supra, 949 F.2d at 18.  The Supreme Court has emphasized that "extreme deprivations are required to make out a[n] [Eighth Amendment] conditions -of-confinement claim."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (contrary to confinement condition cases, the seriousness of an inmate's injury is not a determining factor in excessive force cases).  Because the Constitution "'does not mandate comfortable prisons,'" it is only those deprivations that deny "'the minimal civilized measure of life's necessities'" that are severe enough to implicate the Eighth Amendment.  See Wilson, supra, 501 U.S. at 298 (quoting Rhodes v. Chapman, 452 U.S. 337, 349, 347 (1981)) (no Eighth Amendment violation, even though prison housed 38 percent more prisoners than its design capacity, because overcrowding did not increase violence or lead to deprivations of essential food, medical care, sanitation, or

14

other intolerable conditions of confinement). As a result, plaintiff must prove he suffered a serious deprivation of basic human necessities to implicate the Eighth Amendment in this case.

Based upon the record before the court, plaintiff claims that defendants' actions caused him to suffer two "serious deprivations:" (1) the change of his Quay classification and (2) the denial by officials of a reasonably safe prison environment.[10] As to his first claim, based upon previous cases involving conditions-of-confinement claims, the court cannot find that a change in plaintiff's Quay classification would be a serious deprivation of a basic human need. Because plaintiff cannot satisfy this objective component of the deliberate indifference test, our analysis as to this claim of deprivation ends here.

As to Melvin's second deprivation claim, one of the basic human needs of inmates is reasonable safety. See Helling v. McKinney, 509 U.S. 25, 33 (1993) (nonsmoking inmate who complained of exposure to second-hand smoke could satisfy Eighth Amendment objective test by proving his exposure to smoke caused

---

[10]It is unclear whether plaintiff claims that officials denied him appropriate mental health care in violation of the Eighth Amendment. Because plaintiff has not adequately developed this claim, the court will not consider it at this time. If plaintiff would like to amend his complaint to develop this argument, he may do so; such amendment must be filed with the court before December 24, 1998.

15

serious danger to his future health not tolerated by society).
Thus plaintiff may be able to meet the requirements of the
objective test if he has sufficient evidence that he was
"incarcerated under conditions posing a substantial risk of
serious harm." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

Initially Melvin complained that his safety was threatened
on F-Pod because F-Pod inmates Pete Provencher and Leon Evans had
allegedly threatened to stab him seven years earlier in 1990.
Despite these alleged threats, there is no evidence that these
prisoners caused any trouble to plaintiff after he was
transferred to F-Pod. Plaintiff does not name either of these
inmates as the assailant who allegedly punched him, and there is
no evidence that these particular inmates continued to threaten
plaintiff once he was transferred to F-Pod or that these inmates
made any effort to carry out their alleged threats.

Despite the lack of evidence supporting Melvin's position
that Pete Provencher and Leon Evans threatened his safety while
he was on F-Pod, there is evidence suggesting that *other* F-Pod
inmates jeopardized plaintiff's safety while he was there. For
instance, after Melvin was transferred to F-Pod, he filed a
number of grievances and letters to officials informing them that
he had safety issues with other prisoners. NHSP prisoners and

16

prison officials acknowledge that inmates on F-Pod are more aggressive than those on E-Pod.

Melvin also filed requests to see the mental health counselor, Aquizap, complaining of emotional distress after his transfer to F-Pod. It was not until he moved to F-Pod that he claimed to suffer from emotional distress and Vietnam flashbacks, which could suggest to a jury that Melvin's mental problems stemmed from unreasonably dangerous conditions on F-Pod.

Finally, there is evidence that Melvin was robbed while on F-Pod and had a tooth knocked out by another inmate, which would also support his theory that he lived in unreasonably dangerous conditions on F-Pod. Thus, based on the evidence before the court, plaintiff may be able to prove to a jury that his living conditions were unreasonably dangerous, which would satisfy the objective component of the deliberate indifference test.

Although a jury could find that plaintiff's safety was unreasonably threatened by his transfer to F-Pod, plaintiff still must satisfy the subjective part of the deliberate indifference test. Because "'[t]he infliction of punishment is a deliberate act intended to chastise or deter,'" Wilson, supra, 501 U.S. at 300 (quoting Duckworth v. Franzen, 780 F.2d 645, 652 (7th Cir. 1985)), and not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability

17

for prison officials responsible for the victim's safety," Farmer, supra, 511 U.S. at 834, a mens rea evaluation of officials is essential to the court's Eighth Amendment analysis. Thus this part of the deliberate indifference test requires the court to evaluate the officials' state of mind before and after they transferred Melvin to F-Pod.

Deliberate indifference requires a state of mind that is "more blameworthy than negligence." Farmer, supra, 511 U.S. at 835. Additionally, failure by officials to alleviate a significant risk that officials should have perceived but did not cannot meet the level of knowledge required for the court to find an Eighth Amendment violation. See id. at 838. According to the deliberate indifference standard, prison officials may only be held liable for denying humane living conditions if they *know* that inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it. See id. at 847.

Although a plaintiff must show that prison officials had knowledge of a substantial risk, he may rely on circumstantial evidence to show such knowledge. If a plaintiff presents evidence showing a substantial risk of attacks that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and the defendants being sued were

18

aware of this information, a jury could infer that the defendants had actual knowledge of the risk to the prisoner.  See id. at 842.

On the other hand, good faith on the defendants' part can immunize them against liability.  For instance,

> [p]rison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.
> In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not  averted.

Id. at 844.

Considering all the evidence before the court, Melvin cannot prove that defendants *knew* he faced a substantial risk of serious harm because of his transfer to F-Pod and disregarded that risk by failing to take reasonable measures against it.  The court comes to this conclusion based upon evidence both before and after plaintiff's transfer to F-Pod.

Melvin cannot prove that defendants knew prior to their transferring him to F-Pod that such transfer would create a substantial risk to him.  He claims that defendants changed his Quay classification prior to the transfer because they wanted to

19

punish him by placing him on F-Pod, where they knew he would be abused by other inmates. Contrary to plaintiff's contention, his Quay classification was not changed from Prey to Normal for the purpose of transferring him from E-Pod to F-Pod; such change occurred in March 1995, two full years before the transfer.

In addition, Melvin claims defendants wanted to punish him (by moving him to F-Pod) because he complained that Officer Barnett read his mail. When plaintiff discussed his complaint with defendant Sokolow, Sokolow agreed to discuss the issue with Officer Barnett. Contrary to plaintiff's allegations, it hardly seems plausible that officials would retaliate against plaintiff just because he complained that Officer Barnett read his mail. On the other hand, there is credible evidence that defendants transferred plaintiff to F-Pod, not for punishment purposes, but because of their suspicions that he was operating an illegal canteen operation on E-Pod that posed a security threat to inmates on E-Pod. This legitimate concern for the institution's safety undermines plaintiff's position that the only reason defendants transferred him to F-Pod was to retaliate against him.

Finally, before officials transferred Melvin to F-Pod, they did not have any other evidence besides plaintiff's allegations that other F-Pod inmates had previously threatened him. For instance, plaintiff alleged that he received physical threats

20

from particular F-Pod inmates seven years earlier, yet these threats had never been acted upon by these inmates within the PCU during any of the combined activities of the two pods. Thus, even if these threats were made, officials would have no reason to believe they would actually be carried out once plaintiff was transferred to F-Pod. Based on all of this evidence, plaintiff cannot prove that officials were aware of underlying facts indicating a substantial risk to Melvin before they transferred him to F-Pod.

Based upon his grievances and letters to prison officials, even if plaintiff could prove that defendants became aware of potential risk to him *after* he was transferred to F-Pod, he cannot prove that they ignored this risk or acted unreasonably in addressing it. On the other hand, there is evidence that once officials became aware of some risk to plaintiff on F-Pod, they took measures to abate it. For instance, defendants investigated and responded to all of plaintiff's grievances, even though he only made general comments to officials in his grievances regarding his safety on F-Pod.[11] Brodeur and Cunningham responded to plaintiff's grievances by discussing them with

_____

[11]It is unclear whether any of the defendants were informed of plaintiff's letter to Officer Gauthier on April 9, 1997, see infra at 5, which did state more specifically how plaintiff felt threatened on F-Pod.

Sokolow, who had the opportunity to observe plaintiff on a daily basis. Sokolow did not observe any safety problems between plaintiff and other F-Pod inmates, and relayed this information to these other officials. Additionally, when officials discovered that Melvin had been assaulted by another F-Pod inmate (one month after the assault, based upon information plaintiff relayed to Officer Drew), they responded reasonably to this risk by removing plaintiff from F-Pod and investigating his safety concerns. This evidence suggests that when defendants became aware of a potential risk to plaintiff once he was on F-Pod, they took appropriate steps to alleviate that risk. As long as defendants responded reasonably to the known risk, they will not be considered to have been deliberately indifferent to plaintiff's safety, even if they could not prevent harm to him. See Farmer, supra, 511 U.S. at 844. Accordingly, plaintiff has not met his burden to prove deliberate indifference on the part of defendants.

### b. Due Process

Melvin claims that when defendants transferred him to F-Pod, they punished him without due process in violation of the Fourteenth Amendment, which provides in part that no state shall "deprive any person of life, liberty or property, without due

process of the law." U.S. CONST. amend. XIV, § 1. In determining whether this plaintiff has received appropriate procedural due process under the Fourteenth Amendment, the court considers the following two issues: (1) Does plaintiff have a liberty or property interest with which the state has interfered? (2) If such an interest does exist, were the procedures provided by the state regarding the deprivation of that interest constitutionally sufficient? See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 459-60 (1989). Although plaintiff has not specified exactly the type of interest implicated in his Fourteenth Amendment claim, because of Melvin's pro se status, the court will consider his claim based upon a liberty interest to remain on E-Pod.

Liberty interests protected by the Fourteenth Amendment can arise from only two sources, the United States Constitution or the laws of the states. See Hewitt, supra, 459 U.S. at 466. In regard to constitutionally created liberty interests within the prison setting, the Supreme Court has emphasized that "'[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.'" See Hewitt, supra, 459 U.S.

23

at 468 (quoting <u>Montayne v. Haymes</u>, 427 U.S. 236, 242 (1976),

<u>cert.</u> <u>denied</u>, 431 U.S. 967 (1977)); <u>Sandin</u>, <u>supra</u>, 515 U.S. at

482 (1995) ("federal courts ought to afford appropriate deference

and flexibility to state officials trying to manage a volatile

[prison] environment").  More specifically, the Court has

determined that "no Due Process Clause liberty interest of a duly

convicted prison inmate is infringed when he is transferred . . .

within the State [prison system]," whether he has a hearing or

not.  <u>See</u> <u>Montayne</u>, <u>supra</u>, 427 U.S. at 242 (prisoner had no right

to remain at any particular prison, even though he was not found

guilty of misconduct).  Accordingly, plaintiff did not have a

constitutionally created liberty interest to remain on E-Pod.

Although plaintiff's transfer did not involve a liberty

interest created by the Constitution, his Fourteenth Amendment

claim could still survive if state law creates a liberty interest

for him in regard to his transfer.  State-created interests only

implicate the Due Process Clause when they protect prisoners from

a restraint which "imposes atypical and significant hardship on

the inmate in relation to the ordinary incidents of prison life."

<u>Sandin</u>, <u>supra</u>, 515 U.S. at 483.  For instance, the Court has

ruled that a state discipline that confined a prisoner in

segregation for thirty days "did not present the type of

atypical, significant deprivation in which a State might

24

conceivably create a liberty interest." Sandin, supra, 515 U.S. at 486.

Although Melvin discusses various procedures within NHSP's inmate manual regarding prison discipline, this court cannot find any evidence of state law that would take away the discretionary power of prison officials to transfer inmates to other pods within the same unit of a prison. Furthermore, even though plaintiff was transferred from E-Pod to F-Pod, he still remained within the Protective Custody Unit, and therefore his privileges and treatment by officials should not have changed substantially after the transfer. Thus the court finds that plaintiff's transfer to F-Pod did not cause him such an "atypical hardship" within the prison as to implicate any liberty interest that could even be created by state law.

### 3.  State-Law Claim

Because the court has dismissed the federal claims, it declines to hear this case based solely upon plaintiff's state-law claim of negligence. See 28 U.S.C. § 1367(c) (1998) (authorizing district court to decline jurisdiction after it has dismissed "all claims over which it has original jurisdiction"). It is not uncommon for a court to decline jurisdiction under these circumstances because the balance of competing

jurisdictional factors "weigh[s] strongly in favor of declining jurisdiction over state law claims where foundational federal claims have been dismissed at an early stage in the litigation." Camelio v. American Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).

## Conclusion

For the abovementioned reasons, defendants' motion for summary judgment (document 37) is granted as to all federal claims. The remaining state claim of negligence is dismissed without prejudice. If plaintiff wishes to amend his complaint to include an Eighth Amendment claim regarding his medical care after he was transferred to F-Pod, the court grants him leave to do so. If such an amendment is not filed by December 24, 1998, this case will be closed.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

December 8, 1998

cc:  David Melvin, pro se
     Daniel J. Mullen, Esq.

26